GEORGE S. GAYLORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GERTRUDE H. GAYLORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 109138, 109273. Promulgated February 18, 1944.

*Thomas A. J. Dockweiler, Esq.,* and *James W. Bontems, C. P. A.,* for the petitioners.

*Byron M. Coon, Esq.,* for the respondent.

TURNER, *Judge*: The respondent determined the following deficiencies in income tax against the petitioners for the years indicated:

| Year | George S. Gaylord–Docket No. 109138 Deficiency | Gertrude H. Gaylord–Docket No. 109273 Deficiency |
| --- | --- | --- |
| 1936 | $17,835.82 | $1,087.40 |
| 1937 | 12,033.50 | 4,925.01 |
| 1938 | 10,442.62 | 32.51 |
| 1939 | 9,206.82 | 1,998.71 |

The questions presented are the correctness of the respondent's action (1) in determining that the income for the years 1936 through 1939 of a trust created by petitioners, and of which they were trustees, was taxable to petitioners for said years; (2) in determining that the basis for computing gain on certain corporate stock sold by petitioners and the trust during 1936 through 1939 was $2.83542 per share; (3) in disallowing deductions of $5,076.11 taken by each of the petitioners and the trust for 1938 as losses sustained on demolition of a building; (4) in disallowing $3,456 of a deduction of $4,320 taken by George S. Gaylord in 1939, as a loss sustained on the removal of a pear orchard from a ranch owned by him; and (5) in disallowing $1,400 of the deductions of $2,650 taken by each of the petitioners as losses sustained on the destruction by storm of ornamental trees on property owned by petitioners and occupied by them as their residence. Issue No. 5 was abandoned by the petitioners at the time of the hearing, leaving the first four issues for determination.

For convenience, the discussion of each issue will follow immediately after the findings of fact relating thereto.

*Issue 1.—Taxability to Petitioners of the Income of the Trust.*

FINDINGS OF FACT.

The petitioners are husband and wife, residents of Pasadena, California, and filed separate income tax returns for 1936 through 1939 with the collector of internal revenue for the sixth district of California.

As the issue of their marriage the petitioners have two daughters, Margaret and Gertrude. Margaret was born on November 10, 1905, and married Albert Brunker in 1923. Two children were born of that marriage; one on October 14, 1925, and the other on June 4, 1927, and both are still living. Subsequently Margaret divorced Brunker, and in 1931 married Frederick Ruppel. Both Margaret and Ruppel are still living. The petitioners' other daughter, Gertrude, was born on May 31, 1916, and on May 29, 1937, married Eugene L. Bruce. Gertrude and Bruce are still living, and have one child, who was born in April 1938.

Sometime prior to September 1935, the petitioners decided to set up a trust for the benefit of their two daughters, and in case of the death of a daughter, then for the benefit of the children of such daughter. On December 11, 1935, the petitioners signed and acknowledged a declaration of trust, dated November 7, 1935, in which they were designated both grantors and trustees and designated jointly as trustee. A trust, sometimes hereinafter referred to as the Gaylord trust, was declared with respect to 7,000 shares of the common capital stock of Marathon Paper Mills Co., 5,000 shares of which were contributed by Gaylord and 2,000 shares by Mrs. Gaylord.

The trust instrument did not contain any provision relating to its revocability or irrevocability.

When requesting counsel to prepare the trust instrument, Gaylord told him that he and Mrs. Gaylord desired to form an irrevocable trust with respect to the stock. At the time the petitioners signed the trust instrument, they were advised by counsel that the trust was irrevocable. After signing the instrument, they left it in the custody of counsel. On February 4, 1936, the petitioners filed gift tax returns, prepared by Gaylord, for 1935, in which they reported the creation of an irrevocable trust and the transfer thereto of the above mentioned shares of stock in Marathon Paper Mills Co., sometimes hereinafter called Marathon. Mrs. Gaylord reported the 2,000 shares of stock contributed by her as having a value of $50,000, but, by reason of exclusions and the specific exemption taken, she reported no gift tax liability. Gaylord reported total gifts in the amount of $140,278.08, of which $125,000 was reported as the value of the 5,000 shares of Marathon stock contributed by him to the trust. After

taking exclusions totaling $15,000 and a specific exemption of $50,000, his return showed a gift tax liability of approximately $2,500, which he paid. Subsequently in 1936 Gaylord paid an additional gift tax of approximately $100 with respect to the said return. The certificates for the 7,000 shares of Marathon stock were placed in a safe deposit box in California, in the name of Gaylord and Mrs. Gaylord, as trustees, and remained there until the stock was sold. The trustees sold some of the stock in each of the years 1936 through 1939, the last of it being sold in the latter year. For convenience in making delivery upon sale, certificates were sent from time to time to a bank in Chicago, in which the proceeds of all sales were deposited in an account in the names of the petitioners as trustees.

In connection with the purchase of real property situated in Los Angeles County, California, the trustees, on September 23, 1937, had the trust instrument recorded in the office of the county recorder of that county. In 1938 the trustees made certain purchases of real estate situated in Texas, totaling about $90,000, and in connection therewith had the trust instrument recorded in four counties of that state.

For each of the years 1936 through 1939, a fiduciary income tax return was filed for the trust by the trustees, in which the daughters were shown as the beneficiaries of the trust, with each entitled to one-half of the income thereof. For each of the said years the daughters filed income tax returns and paid the tax shown to be due thereon. In their returns they reported as taxable income received from the trust the amounts shown by the fiduciary income tax returns as having been distributed to them during the respective years.

At the instance of their counsel, the petitioners on March 27, 1940, signed and acknowledged an instrument reading as follows:

DECLARATION BEING A PART OF A CERTAIN DECLARATION OF TRUST
DATED NOVEMBER 7, 1935.

KNOW ALL MEN BY THESE PRESENTS:

THAT WHEREAS the undersigned, George S. Gaylord and Gertrude H. Gaylord, his wife, of the City of Pasadena, in the County of Los Angeles, State of California, do in and by an instrument of even date herewith entitled DECLARATION OF TRUST certify and declare and in and by said instrument have certified and declared that they hold and shall and will hold the following described personal property, to-wit: seven thousand (7,000) shares of the common capital stock of Marathon Paper Mills Company, a Wisconsin corporation, of the par value of Twenty-five Dollars ($25.00) per share, and any and all proceeds thereof, IN TRUST, NEVERTHELESS, for the uses and purposes and upon the terms and conditions set forth in said Declaration of Trust, reference to which Declaration of Trust is hereby made for further particulars thereof; Now, THEREFORE, said George S. Gaylord and Gertrude H. Gaylord do further certify and declare that the trust created and provided for in said Declaration of Trust was always intended and is intended by said trustors and trustees, George S. Gaylord and Gertrude H. Gaylord, to be and is and shall always be absolutely irrevocable

and that this further declaration of said undersigned is and is intended to be and shall always be a part of said Declaration of Trust and is intended to be and shall always be taken with and construed as a part of said Declaration of Trust the same as though this present declaration had been physically incorporated in said Declaration of Trust.

IN WITNESS WHEREOF, said George S. Gaylord and Gertrude H. Gaylord, said trustors and trustees, have set their hands and seals to this instrument as of this 7th day of November, 1935, at Pasadena, California.

After signing and acknowledging the foregoing instrument, the petitioners left it with their counsel. Thereafter the instrument was recorded in Los Angeles and Calaveras Counties, California, on March 28, 1940, and May 14, 1940, respectively.

In determining the deficiencies involved herein, the respondent determined that the net income of the trust for the respective years constituted income of the petitioners, as grantors; that since Gaylord had contributed five-sevenths of the total value of the property contributed to the trust, such fractional part of the net income of the trust was taxable to him; and that since Mrs. Gaylord had contributed two-sevenths of the total value of the property contributed to the trust, such fractional part of the net income of the trust was taxable to her.

OPINION.

The petitioners take the position that the Gaylord trust is and always has been an irrevocable trust, that none of the income thereof for the years 1936 through 1939 constituted income to them, or either of them, but that all of such income was the income of their two daughters, share and share alike, and as such was taxable to the daughters. The respondent contends that under the statutes of California the trust was revocable, and that the income of the trust for the years in controversy was taxable to the petitioners in the proportions determined by him.

Prior to 1931, section 2280 of the Civil Code of California provided as follows:

Not revocable. A trust cannot be revoked by the trustor after its acceptance, actual or presumed, by the trustee and beneficiaries, except by the consent of all the beneficiaries, unless the declaration of trust reserves a power of revocation to the trustor, and in that case the power must be strictly pursued.

In 1931, the Legislature of California amended the section to read as follows:

Revocation of trusts. Unless expressly made irrevocable by the instrument creating the trust, every voluntary trust shall be revocable by the trustor by writing filed with the trustee. When a voluntary trust is revoked by the trustor, the trustee shall transfer to the trustor its full title to the trust estate. Trusts created prior to the date when this act shall become a law shall not be affected hereby.

Accordingly, it is the law of California, and has been since the amendment of section 2280 in 1931, that "every voluntary trust" is revocable by the trustor, unless "expressly made irrevocable by the instrument creating the trust," the only exception to that rule being in the case of trusts created prior to the date of the enactment of the amendment. The trust here was created, and the instrument creating it was executed, in 1935, some four years after the enactment of the amendment in question, and the said instrument did not contain any provision making the trust irrevocable. Furthermore, there can be no doubt, we think, that the trust was a voluntary trust. There is some argument to the effect that the petitioners by mutual promises became obligated, one with the other, to make gifts to their daughters and that the trust was not therefore a voluntary trust within the meaning of section 2280 as amended. That argument is in our opinion without merit. The purpose and intention of the petitioners was to make gifts to or for the benefit of their two daughters, and a gift, which is the transfer of something to another without compensation, implies and denotes an act of choice, a voluntary act. The creation of the trust was merely the method for effecting or making the intended gift, and it takes its voluntary character therefrom. *Touli* v. *Santa Cruz County Title Co.* (Cal. App.), 67 Pac. (2d) 404, holding that a deed of trust given as security for the repayment of a loan did not fall within the provisions of section 2280, as amended, is not in point. We think it apparent therefore that, if the petitioners are to prevail, they must do so on other grounds.

The record shows, and we have found as a fact, that the petitioners had in mind the making of a complete and irrevocable grant to trust. We also think it apparent that their counsel who drew the trust instrument so understood, and the respondent has conceded that when counsel drew the instrument he did not know of the 1931 amendment of section 2280. The record also shows that as soon as he learned of the amendment he drafted the instrument executed by the petitioners on March 27, 1940, declaring that the trust "is and shall always be absolutely irrevocable and that this further declaration * * * is intended to be and shall always be a part of said Declaration of Trust and is intended to be and shall always be taken with and construed as a part of said Declaration of Trust the same as though this present declaration had been physically incorporated in said Declaration of Trust." Such being the facts, the petitioners cite and rely on section 3399 of the California Code, which provides that when through fraud or mutual mistake of the parties a written contract does not truly express the intention of the parties, it may be revised to express such intention, in so far as can be done without prejudice to the rights acquired by third persons, in good faith and for value. Whatever the rights of the parties may be with respect to the revision of the instruments under

section 3399, and whatever the retroactive effect of such revision, it is of no moment here, since section 3399 has no application to a purely voluntary deed. *Enos* v. *Stewart*, 138 Cal. 112; 70 Pac. 1005, and *Robertson* v. *Melville*. 60 Cal. 354; 212 Pac. 723. In *Enos* v. *Stewart*, the grantee of a voluntary deed defectively executed sought to have it reformed in equity, after the grantor's death, as against the grantor's heir at law. In denying the relief sought, the Supreme Court of California said:

* * * It is a universal principle of courts of equity that, in all cases where relief is asked by aiding and correcting mistakes in the execution of instruments and powers, the party seeking such relief must stand upon some equity superior to that of the party against whom he asks it. If the equities are equal, the law must prevail, and the court will remain silent and passive. * * * A court of equity interferes to correct a mistake in a written instrument only in furtherance of justice, and to prevent fraud or some injustice. In this case, by refusing to correct the deed, no fraud or injustice is done to appellant. She has lost nothing, because she paid no consideration for the deed. She has been deprived of nothing the law would otherwise give her. It is true, the intention of the grantor is not carried out; but it would have been equally true if an attempt had been made to make a will, and it had been defective in a vital part. The court could not reform a will, nor make it so that it would comply with the law. In this case the deceased intended to convey the property, but she did not do so. That intention will not now be carried out in favor of one who paid nothing for the conveyance, and against a lawful heir.

In the light of the above pronouncement of the court, it would seem that not only does section 3399 give no support to the contention made here, but in the case of a voluntary deed the mere existence of an unexecuted intention on the part of the donor or grantor creates no rights in the grantee and takes nothing from the grantor, but leaves the grantor the freedom which he theretofore had, as if no such intention had ever existed.

The petitioners further contend that, under the law of California, a valid oral irrevocable trust can be created in personal property, that the Marathon stock was personal property, and that, since they intended to create an irrevocable trust, the trust actually created has at all times subsequent to its inception in 1935 been valid as an oral irrevocable trust. The obvious answer to that contention is that the record fails to show that there was ever any intention to create an oral trust, irrevocable or otherwise, or that any oral trust was, in fact, created. The only trust created was the written trust described in our findings of fact, and it is that trust, not some other trust, with which we are here concerned.

Finally, the petitioners contend that the respondent is estopped from claiming or asserting that the Gaylord trust was ever revocable. This contention is grounded on the fact that petitioners in 1936 filed their gift tax returns for 1935, in which they referred to the trust as an irrevocable trust, that the tax shown on the returns was paid

and has never been refunded, and that the daughters have consistently reported the income from the trust and paid the tax thereon. They also claim to have attached a copy of the trust instrument to each of the gift tax returns. It is contended that the respondent had full knowledge of the character of the trust as early as 1936 and that he should not now be permitted to claim that it was revocable. Estoppel must be specifically pleaded; otherwise it is not an issue in the case. *El Dorado Oil Works*, 46 B. T. A. 994. It has not been pleaded here.

As we read the facts and the law, the petitioners at all times up to the execution of the instrument of March 27, 1940, had and retained the right to revoke the said trust. To hold otherwise would in effect be a rewriting of the California statute or a making of the trust instrument something it was not. We do not possess the power to do either. Since the grantors had the power to revoke the trust during the years before us, the income therefrom is taxable to them. Section 166 of the Revenue Acts of 1936 and 1938, and of the Internal Revenue Code. The respondent has properly allocated the trust income, five-sevenths to Gaylord and two-sevenths to Mrs. Gaylord. *Colonial Trust Co.* v. *Commissioner*, 111 Fed. (2d) 740.

*Issue 2.—Basis for Computing Gain on the Sale of Stock.*

### FINDINGS OF FACT.

About 1911 or 1912, a corporation known as the Menasha Carton Co. was organized and began operations in Menasha, Wisconsin. On July 1, 1917, the outstanding stock of Menasha Carton Co. was 726 shares of common stock, of which 337 shares were owned by Gaylord, 337 shares by S. H. Clinedinst, and the remaining 52 shares by four other individuals. The 337 shares owned by Gaylord had been acquired by him as follows:

| Acquired on or before— | Shares | Cost |
|---|---|---|
| Mar. 1, 1913 | 99½ | $9,950.00 |
| Jan. 16, 1914 | 20 | 2,000.00 |
| Oct. 20, 1914 | 94½ | 9,450.00 |
| Apr. 8, 1915 | 18 | 1,800.00 |
| Mar. 31, 1916 | 100 | 10,000.00 |
| July 1, 1917 | 5 | 1,236.50 |
| Total | 337 | 34,436.50 |

Across the street from the plant of the Menasha Carton Co. was located the Menasha Printing Co., all of the stock of which was owned by Clinedinst. Clinedinst desired to consolidate the assets and businesses of the two corporations into a new corporation, with Gaylord as its manager. It was agreed that Gaylord should purchase sufficient of the stock of the new corporation from Clinedinst to bring his holdings therein up to 40 percent of the outstanding stock. Determination of the basis for consolidation was left to Gaylord. He determined

that the consolidation should be effected on the basis of the appraised value of the physical assets, plus the book value of the quick assets of each of the old corporations. Determination of the value of the stock of the two old corporations through the capitalization of current earnings at ten times such earnings (regarded by Gaylord as a conservative rate) would have indicated a substantially higher value for the stock of the old corporations than was indicated on the basis of value of assets.

The new corporation, Menasha Printing & Carton Co., was formed during the latter half of 1917, and the consolidation was effected as of July 1 of that year, on the basis determined by Gaylord. The appraised value of the physical assets plus the book value of the quick assets of the Menasha Carton Co. was determined to be $186,000, while the value of the assets of the Menasha Printing Co. was determined to be $774,000, making a total of $960,000 as the value of the assets of the two corporations. For these assets, common and preferred stock of the new corporation was issued on a dollar-for-dollar basis, $500,000 in common stock, and $460,000 in preferred stock. The common stock of the new corporation was divided into 5,000 shares and the preferred stock into 4,600 shares, the stock of each class having a par value of $100 per share. Of the $186,000 representing the value of the assets of the Menasha Carton Co., $86,338.89 was allocable to Gaylord's 337 shares of stock. Based on such value and applying the proportions in which the stock of the new corporation was divided between common and preferred, Gaylord was entitled, for his 337 shares of Carton Co. stock, to 449.6815 shares of common stock and 413.7074 shares of preferred stock. The actual division, however, was $41,000 for 410 shares of preferred stock and $45,338.89 for 453.3889 shares of common stock. In addition, Gaylord purchased from Clinedinst sufficient shares of common stock of the new corporation to bring his common stock holdings therein to 1,975 shares. In payment for the stock purchased from Clinedinst, he gave his promissory note for $152,161.11, which, with the $45,338.89 representing the value of his shares in the Carton Co. stock against which common stock of the new corporation was issued, brought his total payments for the 1,975 shares of common stock to $197,500. The fair market value of the common shares acquired in the consolidation was $100 per share. The note given to Clinedinst was dated August 30, 1917, was due three years after date, and bore interest at the rate of 6 percent per annum. It was paid in full on September 29, 1924. Of the 1,975 shares of common stock of the new corporation so acquired by Gaylord, 1,525 shares were issued to him under certificate No. 2, dated August 30, 1917, and were put up by him as collateral for the payment of the note to Clinedinst. In his income tax return for 1917, Gaylord did not report any income on the exchange of his 337 shares of Menasha Carton Co. stock for stock in the new corporation.

In 1922 or 1923 Gaylord purchased the remaining interest of Cline-dinst in the Menasha Printing & Carton Co. In the meantime, all the preferred stock issued in the 1917 consolidation had been retired. During the interval between the consolidation in 1917 and October 31, 1927, Gaylord sold some small lots of his common stock. In 1925 he received a 100 percent stock dividend on the stock then held, and at October 31, 1927, the parties are in agreement that he owned and held 3,357 shares of such stock. Of the stock so held, 350 shares had been transferred by Gaylord in 1925 to his brother, C. W. Gaylord, for 432 shares of the stock of Robert Gaylord, Inc. In the latter part of 1926 or the early part of 1927, C. W. Gaylord expressed the desire to reacquire the 432 shares of Robert Gaylord, Inc., stock. He wanted the shares for use in connection with a reorganization of his corporation. Petitioner Gaylord agreed to sell the 432 shares for $300,000, but the offer was not accepted. Thereafter C. W. Gaylord proposed that the previous exchange of 350 shares of Menasha Printing & Carton Co. stock for the 432 shares of the Robert Gaylord, Inc., stock be canceled and that steps be taken to restore the parties to the position that they would have been in if the exchange had not been made. The "whole arrangement" was to be canceled "as though it had never existed." The offer was accepted and the shares were returned to their original owners, each of the parties paying over any and all dividends which had been received on the respective stocks during the interval.

On October 31, 1927, the Menasha Products Co., such then being the name of the Menasha Printing & Carton Co., was merged with the Marathon Paper Mills Co. In this merger Gaylord received 6,728 shares of the Marathon Paper Mills Co. stock and $1,038,000 par value of its 5 percent bonds in exchange for his 3,357 shares of common stock of the Menasha Products Co. In December 1929 the Marathon stock was split four shares for one.

On none of the above transactions involving exchanges of stock for stock did petitioner George S. Gaylord report any gain for income tax purposes.

Gaylord, Mrs. Gaylord, and the Gaylord trust reported sales of the following number of shares of common stock in the Marathon Paper Mills Co. in their respective income tax returns for the indicated years:

| | Shares sold | | | |
| --- | --- | --- | --- | --- |
| | 1936 | 1937 | 1938 | 1939 |
| Gaylord | 4,950 | 2,800 | 5,300 | 2,462 |
| Mrs. Gaylord | | 2,100 | 400 | 500 |
| Gaylord trust | 4,000 | 1,600 | 1,000 | 400 |

The gain reported on these sales was computed on a basis of $8.21 per share. In determining the deficiencies herein, the respondent determined that the correct basis was $2.83542 per share, except as to 100 of the shares sold by Gaylord in 1939. The 100 shares were acquired by purchase in 1933 for $1,700. The 7,000 shares sold by the trust were the shares contributed by the petitioners to the trust in 1935. The 2,000 shares contributed by Mrs. Gaylord to the trust had been given to her by Gaylord in 1930. According to the respondent's determination, the shares sold by Mrs. Gaylord personally had been given to her by Gaylord in February 1932, and that determination is not disputed.

### OPINION.

The question here is the basis for determining gain or loss to the petitioners on the sale of stock in the Marathon Paper Mills Co. One hundred of the shares sold by Gaylord in 1939 were purchased by him in 1933 for $1,700, and as to those shares there is no controversy. The remaining shares were obtained in a four-for-one split of shares received by Gaylord in the merger in 1927 of the Menasha Products Co., formerly Menasha Printing & Carton Co., with the Marathon Paper Mills Co. Both parties have treated that merger as a transaction on which gain or loss was not to be recognized for income tax purposes. Consequently, the basis for gain or loss on the stock and bonds received by Gaylord as a result of that merger is the same as his basis for the 3,357 shares of Menasha Products Co. stock exchanged for the stock and bonds. There is no dispute between the parties as to the method of allocating basis between the Marathon stock and bonds; neither is there any contention that the basis of the Marathon stock sold by Mrs. Gaylord and the trust is different from the basis of Gaylord himself. As a result, once the basis to Gaylord for the 3,357 shares of Menasha Products Co. stock is fixed, determination of the basis of the Marathon Paper Mills Co. shares sold is a matter of mathematical computation.

From the evidence and the agreed items appearing in the respective computations of the parties, it is apparent that the 3,357 shares of Menasha Products Co. stock represent a portion of the 1,975 shares of Menasha Printing & Carton Co. common shares acquired by Gaylord in the consolidation of Menasha Carton Co. and Menasha Printing Co., and by purchase from Clinedinst, in 1917, plus the 100 percent stock dividend thereon in 1925. It is true that Gaylord did purchase some additional shares from Clinedinst in 1923, but the evidence of record does not show the number of shares so purchased or the price paid. The respondent, however, in the computation which he contends is correct. shows a purchase of 50 shares by Gaylord in 1923, which purchase is not shown by the petitioner in his computation;

but the respondent's tabulation likewise shows an offsetting sale of 50 shares not shown in petitioner's tabulation, and the net result is that the parties in their tabulations are in agreement that the shares of Menasha Products Co. disposed of in the 1927 merger represent the unsold portion of the 1,975 shares acquired by Gaylord in 1917 plus the stock dividend in 1925.

The principal difference in the computations of the parties is in the method of arriving at the basis for the 1,975 shares of common stock of the Menasha Printing & Carton Co. acquired by Gaylord in 1917. The petitioners contend that Gaylord's cost of the said 1,975 common shares and the 410 preferred shares was the sum of the $152,161.11 paid to Clinedinst and $350,000 claimed as the fair market value of the 337 shares of Carton Co. stock surrendered by Gaylord in the consolidation. or a total of $502,161.11. From that amount, they deduct $20,000 as the amount received on retirement of the preferred stock and claim that the remainder represents the basis for the 1,975 shares of Menasha Printing & Carton Co. common stock. From that figure the petitioners by computation arrive at $8.21 per share as the basis for the Marathon Paper Mills Co. stock sold by them during the taxable years.

The respondent, on the other hand, treats the $152,161.11 paid to Clinedinst as the cost of 1,525 shares of the common stock, and $34,-436.50. Gaylord's cost of the 337 shares of Carton Co. stock, as the cost to him of the remaining common shares and the preferred shares of the new corporation. Of the $34,436.50, he allocates $10,468.70 as the cost of the preferred shares and treats the remaining $23,967.80 as the cost of the common shares received in the consolidation, as distinguished from the 1,525 shares acquired from Clinedinst by purchase. From a total cost of $176,128.91 for the common shares, he has computed a cost basis for the Marathon shares sold by the petitioners during the taxable years of $2.8351⁄2 per share.

The difficulty with the computations of the parties is that both are wrong in certain respects. The revenue act in force at the time of the 1917 consolidation contained no provision for the nonrecognition of gain in the case of corporate reorganizations or the carry-over of the basis of the old stock to the new, and the parties so agree. To the extent, then, that Gaylord acquired preferred and common shares of stock of the Menasha Printing & Carton Co. for his 337 shares of Menasha Carton Co. stock in the 1917 consolidation, he realized gain or sustained loss equal to the difference between the fair market value of the shares so acquired, and his cost or other basis for the Carton Co. stock exchanged and the basis of the Carton Co. shares surrendered, adjusted by the gain or loss realized or sustained, became the basis to him of the Menasha Printing & Carton Co. shares acquired. In other words, the basis for the Menasha Printing &

Carton Co. shares was the same as their fair market value when acquired. One hundred dollars per share was the price fixed by the parties for the new shares in their dealings with each other. That price was arrived at by taking the value as of the date of consolidation of the combined assets of the consolidated corporations. The petitioners contend that such a value was low and was determined upon by Gaylord because it gave him a financial advantage in the consolidation. They argue that a value represented by capitalization of the current earnings of the businesses at the rate of ten for one would give a much higher value and that this higher value is the fair market value. The only evidence in the record as to the current profits of the two businesses is to be found in the oral testimony of Gaylord. He did not testify from the books and did not attempt to give exact figures, but testified from memory and in what he called "round figures." Furthermore, it is to be noted that the year in which the consolidation occurred was a war year, and in such years business profits are likely to be abnormal and the hazards much greater. Clinedinst had more at stake in the two corporations than Gaylord, and yet he was willing to deal on the basis of value of assets, which gave an indicated value for the stock of the new corporation of $100 per share. Considering all of the evidence, we have concluded and found that the fair market value of the preferred and common shares of the Menasha Printing & Carton Co. stock acquired by Gaylord in the consolidation was $100 per share. As for the shares acquired from Clinedinst personally, that was the price actually pa,d. The facts show that the preferred shares were retired and that only common shares were involved in the 1927 merger with the Marathon Paper Mills Co. It also appears that a 100 percent stock dividend was declared by the Menasha Printing & Carton Co. in 1925 and that Gaylord received such a dividend on the common shares which he still owned, and that the shares subsequently used in the 1927 merger were shares originally held, plus the stock dividend shares received in 1925. Dividing the basis of the original shares with the stock dividend shares, we arrive at a basis of $50 per share for the 3,357 shares used in the 1927 merger, and computation of the basis for the Marathon Paper Mills Co. shares sold by the petitioners and the trust during the taxable years should be computed therefrom.

*Issue 3.—Losses Sustained on Demolition of Building.*

#### FINDINGS OF FACT.

In March 1938. Gaylord, Mrs. Gaylord. and the Gaylord trust each purchased a one-third interest in a rental property situated in Santa Monica, California, at a total purchase price of $127,500. The property consisted of a lot 55 feet wide (facing on a street) by 150 feet deep, improved by a one-story brick store building. The building was

55 feet by 80 feet in size, and was divided into three rooms of approximately equal widths. The value of the building was $15,228.33, which was the portion of the purchase price for the whole property allocable as the cost of the building. Each of the rooms in the building was occupied by separate tenants. At the time of purchase, the petitioners did not have any intention of demolishing the building or of erecting a new one, but contemplated at most the remodeling of the front, if required by tenants.

One of the tenants, J. Braufman, was conducting a drug business. The lease under which he formerly occupied the premises had expired on March 14, 1938, and he was occupying the premises on a month-to-month basis. The lease of another tenant, Bassett Jewelry Co., expired July 31, 1938, while the lease of the other tenant, GallenKamp Stores Co., which operated a shoe store, expired November 30, 1938. About May or June, steps were taken by the petitioner to obtain new leases from the tenants. GallenKamp Stores Co., the first tenant approached, stated that due to expanding business it required more space. While consideration was being given by the petitioners to the remodeling of the building, in order to provide the company with more space, it obtained a lease at a near-by location. Prospective tenants for the GallenKamp space likewise desired more space. Upon investigation, it was found that the partitions in the building were bearing partitions, that to move them would necessitate the complete removal of the roof, which would be almost as costly as to demolish the building and erect a light steel building. In this situation the petitioners decided to obtain agreements from the present tenants extending their occupancy through December 31, 1938. In June 1938 such agreements were made with Braufman and the Bassett Jewelry Co., and in August with the GallenKamp Stores Co. A tenant was found who wanted a 27-foot frontage and more depth than the brick building afforded. Two other tenants were found who wanted less frontage than that of the rooms occupied by Braufman and the Bassett Jewelry Co., but more depth.

By late summer or early fall of 1938, the petitioners decided to accept the three prospective tenants, to demolish the brick building, and to erect a new light steel structure on the premises. On January 2, 1939, demolition of the brick building was begun, and a new steel structure was erected. The new building had a frontage of 55 feet, the same frontage as the old brick building, but was 120 feet deep, and cost $33,000.

In their income tax returns for 1938, Gaylord, Mrs. Gaylord, and the Gaylord trust each took a deduction of $5,076.11 as their proportionate share of a loss sustained on the brick building. The respondent disallowed the deductions.

At the hearing the respondent took the position that the Santa Monica property was acquired by the petitioners and the trust with the intention of razing the building and erecting on the premises a more desirable building and that no part of the purchase price was allocable to the building thereon. On brief, he concedes that this was not the case, and states that all that remains in controversy on this issue is the value of the building, which he contends was not in excess of $15.000. The petitioners contend that the value of the building was at least $15,228.33, the total of the three deductions taken.

On the evidence, we have found that the value of the building at the time of purchase was $15,228.33 and that such amount was the portion of the total purchase price of the property properly allocable to the building. We accordingly hold for the petitioners on this issue.

*Issue 4.—Loss Resulting From Destruction of Pear Orchard.*

FINDINGS OF FACT.

In 1931 Gaylord purchased certain land in Monterey County, California, bordering on the Carmel River, on which he raised chickens and hogs. In 1935, and principally for the purpose of obtaining a way to get into his ranch from the opposite side of the river, he purchased a 10½-acre tract of land situated on the opposite side and bordering on the river, at a cost of $900 an acre. Of the tract purchased, about one acre was covered by the river and by a road; one acre was not devoted to any purpose; while on the remainder of the tract were pear and cherry trees. The pear trees had been set out from about 1930 to 1932. Gaylord intended to operate, and did for several years operate, the orchard on a commercial basis, but about 1937 or 1938 the selling price of pears had dropped to $15.50 to $16.50 per ton, the lowest price ever reached in that locality. Operation of the orchard at such prices was unprofitable. During the period of depressed prices approximately one-third of the pear trees in Carmel Valley were taken out.

Since the operation of the pear orchard was not profitable at the prevailing price for pears. and because of his desire to use the land for the growing of alfalfa in connection with his chicken and hog business, Gaylord. in the early part of 1939, removed all of the pear trees except 25. The trees were sawed and used for wood on the ranch. At the time of removal the trees were in full bearing stage and were approaching the years which would normally be their best producing years. Since the removal of the trees the land has been used for the purpose of growing alfalfa.

Ordinarily an acre of pear orchard represents approximately 64 trees. Four hundred and thirty-two pear trees were removed by Gaylord from his property. On his income tax return for 1939, he took a deduction of $4,320, or $10 per tree, as the amount of loss sustained by reason of the destruction of the pear trees. Of the deduction so claimed, the respondent, in determining the deficiency herein, allowed $864, or $2 per tree, and disallowed the remainder.

The loss sustained by Gaylord by reason of the destruction of the pear trees was $5 per tree, or $2,160.

### OPINION.

In 1935 the 10½-acre tract here in question was purchased by Gaylord for $900 an acre. Most of the tract was set in pear trees, but the purchase of the land and the orchard was made as a unit and there was no allocation of price between the land and the trees. The orchard was operated commercially for a number of years, but in 1939, due to the drop in the price of pears, Gaylord decided to discontinue the operation of the pear orchard and to convert the land to other uses. As a result, all of the pear trees, with the exception of 25, were destroyed and the land has since been used for the growing of alfalfa in conjunction with his chicken and hog operation adjoining. The evidence from which the basis for determining the loss resulting from the destruction of the pear trees must be determined is sketchy, and in the main represents conclusions drawn by Gaylord from data collected by him with respect to planting, raising, and maintaining a pear orchard and by comparison of his purchase of the pear orchard with two purchases of property in the same locality, one property being a pear orchard and the other having no trees. In the case of those purchases, the land without trees sold for half the price at which the land with the trees was sold. The dates of the sales in those instances were approximately one year from Gaylord's purchase of the property here in question, or one year from the destruction of his pear trees; the record does not show which. Gaylord, in arriving at the deduction claimed, estimated that the number of pear trees destroyed was 432, and the respondent in that connection raises no question.

After considering all of the evidence of record, it is our opinion, and we have found as a fact, that the loss sustained by Gaylord by reason of the destruction of the pear trees in the year 1939 amounted to $5 per tree, or a total of $2,160. To that extent, the deduction claimed by him is allowed.

Gaylord assigned as error in his petition the respondent's disallowance of $467.10 of a deduction of $517.10 taken in his 1937 return as attorney's fee paid for advice on financial matters. In his answer, the respondent denied error. No evidence was submitted on this

issue, and it is not urged on brief. Apparently the issue has been abandoned, and the respondent's disallowance is sustained.

*Decisions will be entered under Rule 50.*