ESTATE OF ALVIN HILL, DECEASED, CHILTON HILL, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4661-73.    Filed August 11, 1975.

*Wentworth T. Durant* and *Ronald M. Mankoff,* for the petitioner.

*David L. Jordan,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency in the Federal estate tax of the Estate of Alvin Hill in the amount of $89,753.78. The issues to be decided are: (1) Whether at the date of his death, Alvin Hill had the power to revoke a trust created for his daughter, thus causing the assets of the trust to be includable in his estate under section 2038(a)(1) of the Internal Revenue Code of 1954; [1] and (2) whether a gift of land to Chilton Hill was made in contemplation of death within the meaning of section 2035. In the event we find that Alvin Hill did not retain the power to revoke the trust for his daughter, the Commissioner also contends that the gift in trust was made in contemplation of death.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

Alvin Hill (the decedent), a widower, died testate, a resident of Texas, on October 26, 1970. His will was probated in Amarillo, Tex. Chilton Hill, the executor, resided in Oklahoma City, Okla., at the time of the filing of the petition herein. A Federal estate tax return for the estate was filed with the Internal Revenue Service Center, Austin, Tex.

The decedent was survived by his three children: Chilton Hill (Chilton), Polly Hill Trigg (Polly), and Peggy Hill Clark (Peggy). He made gifts in excess of $150,000 each to Chilton and Peggy during the 1960's. Although he wished to make equal gifts to Polly at that time, she had refused to accept them from her father because of her ill feelings toward her stepmother. The gifts to his children were made out of love and affection for them as well as for purposes of tax planning.

In 1961, the decedent bought a cottage on Lake Texoma in Oklahoma (the cottage). He was very fond of the cottage and looked upon it as a possible retirement home. The cottage was used for family reunions, recreation, and entertaining business acquaintances. Chilton assisted the decedent in selecting and remodeling the cottage, and they frequently went there together. In addition, Chilton and his family often used it alone as a weekend retreat. On numerous occasions, the decedent said that he intended to give the cottage to Chilton. He consulted Chilton whenever changes were made to the cottage. He felt that it really belonged to Chilton since Chilton and his family used it more than anyone else.

In January or February 1970, the decedent took a Caribbean cruise. He became sick on the trip and did not recover when he returned home. Until that time, he had enjoyed very good health. In March 1970, he went to his family physician complaining of vomiting blood and feeling very weak. On March 24, 1970, the decedent was admitted to the hospital in Amarillo, Tex. After undergoing tests, he was advised by his doctor that there was an obstruction at the entrance to his stomach, caused by an ulcer or a tumor, and that he should have an exploratory abdominal operation. He was also told that the operation would be major surgery and, in view of his age, should be considered serious.

Upon being advised of his condition and the pending surgery, the decedent requested that he be given a few days to straighten out his affairs. Thereupon, he called his attorney and children and asked them to come to the hospital the next day. They all

came on March 26, and the decedent then asked Polly if she would now accept a substantial gift of stock in trust. She agreed, and he told the attorney what he wished done.

The decedent explained to his attorney that he wished to convey certain stock to Chilton in trust for Polly. The stock was to be transferred from his account at Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). The attorney was directed to draft the necessary instruments to create the trust. In addition, the decedent directed his attorney to draft the following additional instruments as quickly as possible: a new will; a deed of gift to Chilton for the cottage; and a general power of attorney to Chilton and the decedent's accountant. The attorney immediately began preparing the documents, working late that night.

On the following day, the attorney returned to the hospital with the completed documents. After reviewing them, the decedent requested certain changes be made. Peggy typed some of the changes at the hospital, and the attorney returned to his office to make other changes. After all the changes had been made, the decedent executed the documents.

The trust created for Polly was called the "Polly Hill Trigg Trust #2" (Trigg trust). The granting clause of such trust provided:

> That I, ALVIN HILL, for and in consideration of the love and affection which I bear for my daughter, POLLY HILL TRIGG, have given and delivered, and by these presents do give and deliver unto CHILTON HILL, in trust, for the said Polly Hill Trigg the following stocks and/or securities * * *

In accordance with such provision, stocks and securities worth $158,171.05 were transferred to Chilton. This gift approximately equaled those previously given to Chilton and Peggy. The trust was to last for 10 years with income to be distributed at least annually. The trustee was given the power to distribute portions of the trust corpus to Polly if necessary for her support. After 10 years, the trust corpus was to be distributed to her. The trustee's powers were stated as follows:

> 5. My Trustee, his substitutes and successors, shall have the power to handle, manage, control and dispose of the trust property, to invest and reinvest trust funds, to purchase, sell, improve, mortgage, lease, trade or otherwise do everything that they deem advisable and anything that might be done legally by them in absolute ownership except Sections 10, 11 and 12 of the Texas Trust Act shall be binding upon any trustee acting hereunder.

The decedent warranted his title to the transferred stock as follows:

To HAVE AND To HOLD the above described property and premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Chilton Hill, Trustee, his successors and assigns, and I do hereby bind myself, my heirs, executors and administrators, to warrant and forever defend all and singular the said premises unto the said Chilton Hill, Trustee, his successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

On the same day, the decedent also executed the stock transfer. It listed the stocks and securities to be transferred to the Trigg trust and provided: [2]

I do hereby irrevocably constitute and appoint the said Chilton Hill agent and attorney to transfer the stock on the books of the pertinent corporations. * * *

On the same day, the decedent also executed his new will, the deed transferring the lake cottage to Chilton, and the general power of attorney, appointing Chilton and the decedent's accountant as his attorneys in fact. The will provided for a specific bequest of $10,000 to the decedent's housekeeper, and the balance of the estate was to be divided equally among the decedent's children. Each child's portion was to be held in trust for 5 years. The will revoked all prior wills and codicils. It differed from the decedent's prior will in two respects: the new will added the bequest to the housekeeper, and it made the bequests to his children in trust. The gifts to the children were placed in trust because of the decedent's concern for his daughters.

The decedent underwent surgery on March 30, 1970. The surgeon found a perforated duodenal ulcer with an abscess, and because of the presence of the infection, he was unable to explore for cancer. After the operation, the decedent's recovery was normal for a person his age. He left the hospital after 2 weeks and appeared to recover. However, in July, he developed pains in his back and reentered the hospital for further surgery. At that time, cancer was found, and he died of cancer on October 26, 1970.

---

[2] Two versions of the stock transfer were offered in evidence, in one of which the word "trustee" was included immediately before the word "agent." We have concluded that the instrument executed by the decedent did not include the word "trustee." However, in view of our conclusion as to the effect of the stock transfer, it is immaterial as to whether that instrument included the word "trustee."

Prior to his death, the decedent purchased certain marketable United States Treasury bonds (bonds). These bonds could be used at face value to pay Federal estate taxes, and those so used were valued at face value on the petitioner's Federal estate tax return. The balance of the bonds were valued at their fair market value at the time of the decedent's death.

In his notice of deficiency, the Commissioner determined that the fair market value of the stocks and securities transferred to the Trigg trust on March 27, 1970, and the fair market value of the cottage, $30,500, were includable in the petitioner's gross estate. Because of these determinations, he also determined that the balance of the bonds should have been valued at face value and not fair market value.

OPINION

Section 2038(a)(1) provides in pertinent part:

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power * * * by the decedent * * * to * * * revoke * * *

The Commissioner argues that the decedent, at his death, had the power under Texas law to revoke the Trigg trust.

The decedent was a resident of Texas and created the Trigg trust there. Under Texas law,

Every trust shall be revocable by the trustor during his lifetime, unless expressly made irrevocable by the terms of the instrument creating the same or by a supplement or amendment thereto. [Tex. Rev. Civ. Stat. Ann. art. 7425b-41 (1960).]

In construing such provision, the Texas courts have not required that the trust instruments contain specific words of art to create an irrevocable trust. *Austin Lake Estates Recreation Club, Inc. v. Gilliam,* 493 S.W. 2d 343, 347 (Tex. Civ. App. 1973). However, it must contain express terms and language which establish that it is irrevocable; irrevocability cannot be established by mere inference or implication. *McCauley v. Simmer,* 336 S.W. 2d 872, 881 (Tex. Civ. App. 1960); see *Butler v. Shelton,* 408 S.W. 2d 530, 534 (Tex. Civ. App. 1966).

The Trigg trust does not expressly state that it is irrevocable. Nevertheless, the petitioner argues that by its terms, it is clear that the trust was intended to be irrevocable. In support of that argument, it particularly relies upon the provisions of paragraph 5 of the trust instrument, which describes the powers given to the trustee. Such paragraph declares that the powers are given to "My Trustee, his substitutes and successors" and authorizes any trustee among other things to "do everything that they deem advisable and anything that might be done legally by them in absolute ownership."

For this purpose, "absolute" as used in the trust instrument is not synonymous with irrevocable. The Texas Trust Act was borrowed from the Oklahoma Trust Act and Texas courts have placed great reliance on Oklahoma decisions construing their act. *Shellberg v. Shellberg,* 459 S.W. 2d 465, 469 (Tex. Civ. App. 1970); cf. *Koy v. Schneider,* 110 Tex. 369, 221 S.W. 880 (1920). In *In re O'Brien's Trust Estate,* 172 P. 2d 607, 609 (Okla. 1946), the Oklahoma courts had to decide whether a trust was irrevocable under the provision of the Oklahoma law which corresponds to article 7425b-41 of the Texas law. In that case, the word "absolute" had been used to describe the transfer to the trustee, but the court held that the use of such word did not make the trust irrevocable. In the light of that decision, it appears that the Texas courts would not find that the use of the word "absolute" was sufficient to make the Trigg trust irrevocable.

Moreover, the word "absolute" is used in the Trigg trust merely to describe the powers given to the trustee; it does not relate to the nature of the title transferred to the trustee. It merely indicates that so long as the trust is in existence, the trustee is to have the powers to deal with the property as if he were the absolute owner. In that provision, there is nothing to indicate that the transfer was to be absolute or that the trustor was relinquishing all powers to revoke the trust.

Nor does the fact that the powers are given to the successors or assigns of the trustee indicate that the transfer was irrevocable. The petitioner suggests that with this power, the trustee could even dispose of the property contrary to his fiduciary responsibilities, but irrespective of whether that suggestion reflects a proper interpretation of the trust instrument, it does not indicate that the transfer to the trustee was to be irrevocable. On the termination of the trust, the trustee was obligated to transfer

the corpus to the beneficiary, but in doing so, he would be merely carrying out his fiduciary responsibilities; thus, giving him the power to make such a transfer is no indication that the trustor was giving up the power to revoke the trust.

In support of the contention that the trust instrument indicated that the trust was to be irrevocable, the petitioner also relies upon the provisions of the warranty clause, which provides in part:

I do hereby bind myself, my heirs, executors and administrators, to warrant and *forever* defend all and singular the said premises unto the said Chilton Hill, Trustee, his successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof. [Emphasis added.]

However, the Texas courts have considered the effect of the use of the word "forever" in the warranty clause, and in *Butler v. Shelton,* 408 S.W. 2d at 534, the court said:

It would be a strained and unwarranted construction to hold that the statutory form of general warranty in a trust deed has the effect of expressly making it irrevocable. To make a trust irrevocable the act requires express terms of irrevocability. * * *

The petitioner contends that *Butler* is not controlling for a variety of reasons. First, it argues that the quoted language was gratuitous dictum in the case. However, in *Butler,* the appellants argued that a deed of trust in the form of a general warranty deed was expressly made irrevocable because of the warranty clause. The court clearly rejected such argument in the quoted portion of their opinion. Thus, such quote was in no way mere dictum; it was the core of their decision.

The petitioner seeks to distinguish *Butler* because there the warranty ran to the trustees and "their successors as trustees," while here the warranty ran to "Chilton Hill, Trustee, his successors and assigns." Yet, no reason is given why this difference should lead to a different result, nor can we perceive how the language in the Trigg trust makes the trust expressly irrevocable.

The petitioner also asserts that *Butler* is distinguishable from the present case since the trust warranty here contained the term "forever," while the warranty in *Butler* did not. However, in *Butler,* the court said:

Appellants' position here is that the conveyance in trust was in the form of a general warranty deed wherein in warranting the title into the trustees the customary words "*to WARRANT and FOREVER DEFEND * * *" were used,*

however, the warranty above quoted follows the statutory language, except for the substitution of the words. "and their successors as trustees," for the statutory words "his heirs and assigns forever." Thus the word "forever" is omitted *from the latter* phrase. * * * [408 S.W. 2d at 533; emphasis added.]

Hence, contrary to the petitioner's assertion, the warranty clause in *Butler* used the term "forever" in exactly the same manner as it was used in the Trigg trust.

In considering the petitioner's contentions and the provisions of the instrument creating the Trigg trust, our responsibility is to apply the Texas law as would a Texas court. *Commissioner v. Estate of Bosch,* 387 U.S. 456 (1967). Here, we have a Texas statute which must be applied in determining whether the trust was irrevocable. Whatever might be the result in another jurisdiction without such a statute is immaterial in this case; our inquiry is confined to carrying out the purposes of that Texas statute and construing it in the same manner as do the Texas courts. Although words of art need not be used to make a trust irrevocable, the statute makes clear that the trustor has the power of revocation, unless the provisions of the trust instrument clearly indicate otherwise. The search for his intention is limited to the trust instrument or a supplement or amendment thereto; it does not encompass the consideration of parol evidence. In line with the Texas decisions, we find nothing in the terms of the Trigg trust instrument to indicate with sufficient clarity that the decedent intended to make the trust irrevocable. See *Austin Lake Estates Recreation Club, Inc. v. Gilliam,* 493 S.W. 2d 343, 347 (Tex. Civ. App. 1973); *Butler v. Shelton,* 408 S.W. 2d 530, 534 (Tex. Civ. App. 1966); *McCauley v. Simmer,* 336 S.W. 2d 872 (Tex. Civ. App. 1960).

In addition, the petitioner argues that even if the instrument creating the Trigg trust did not contain provisions indicating that the trust was irrevocable, a supplement thereto did so indicate. According to the petitioner, the stock transfer executed by the decedent was a supplement to the trust and expressly made it irrevocable. The stock transfer irrevocably appointed Chilton as the decedent's agent and attorney to transfer on the corporate books the stocks given to the Trigg trust. While it is not clear whether under Texas law the stock transfer should be considered a "supplement" to the trust instrument, it is clear that the irrevocable appointment of Chilton as a transfer agent did not make the trust irrevocable. The stock transfer only made the

agency relationship irrevocable. Since the agency relationship was created to perform only one duty, i.e., transfer the title to the designated stocks on the corporate books, it is clear that the creation of such an agency relationship was not sufficient to make the trust irrevocable.

Furthermore, the creation of an "irrevocable" agency relationship in the stock transfer furnishes additional support for our conclusion that the terms of the trust instrument did not make the trust irrevocable. The terms of the stock transfer show that the decedent's attorney was familiar with the term "irrevocable," and his failure to use it, or any similar language, to describe the transfer in trust provides an additional reason for concluding that the draftsman of the trust did not intend to make it irrevocable.

In its brief, the petitioner argues, in the alternative, that the decedent created an irrevocable oral trust prior to the written trust. The Commissioner contends that such argument constituted a new issue presented for the first time on brief, but since we find no evidence of an irrevocable oral trust, we need not pass on the question of whether the issue was timely raised.

Parol trusts of personal property are recognized as valid in Texas. Tex. Rev. Civ. Stat. Ann. art. 7425b-7(E) (1960). However, a trust to be created in the future is unenforceable. *Fleck v. Baldwin,* 141 Tex. 340, 172 S.W. 2d 975 (1943); see *Unthank v. Rippstein,* 386 S.W. 2d 134 (Tex. 1964). The decedent directed his attorney to draw the instruments necessary to create the trust. It is obvious that no prior oral trust existed. There is no evidence that the decedent merely wished the written trust to memorialize a prior oral trust. All the evidence shows that the decedent *wanted* to create a trust for his daughter, Polly, and directed his attorney to draft the necessary papers to *create* such a trust.

Finally, the petitioner contends that the parol evidence indicates that the decedent intended to make the Trigg trust irrevocable and that under Texas law, the trust could be reformed to carry out such intention. However, we need not decide whether the parol evidence is sufficient to indicate that the trust was intended to be irrevocable or whether the Texas courts would reform the trust to make it irrevocable. "[T]here is ample authority that 'not even judicial reformation can operate to change the federal tax consequences of a completed transaction.'"

*Samuel S. Davis,* 55 T.C. 416, 428 (1970), quoting *Van Den Wymelenberg v. United States,* 397 F. 2d 443, 445 (7th Cir. 1968), cert. denied 393 U.S. 953 (1968); see *Harris v. Commissioner,* 461 F. 2d 554, 556 n. 2 (5th Cir. 1972), affg. a Memorandum Opinion of this Court; *Emerson Institute v. United States,* 356 F. 2d 824 (D.C. Cir. 1966), cert. denied 385 U.S. 822 (1966); *Sinopoulo v. Jones,* 154 F. 2d 648 (10th Cir. 1946); *Loggie v. Thomas,* 152 F. 2d 636 (5th Cir. 1945); *M. T. Straight Trust,* 24 T.C. 69 (1955), affd. 245 F. 2d 327 (8th Cir. 1957); *Erik Krag,* 8 T.C. 1091 (1947); but see *Flitcroft v. Commissioner,* 328 F. 2d 449 (9th Cir. 1964), revg. 39 T.C. 52 (1962). In the *Sinopoulo* case, the Tenth Circuit Court of Appeals was required to consider the Oklahoma statute corresponding to article 7425b-41 of the Texas statute. An Oklahoma court had granted reformation of a trust instrument to make it irrevocable, but the Tenth Circuit held that for Federal tax purposes, the reformation should be disregarded. In *Loggie,* the Fifth Circuit held that a declaratory judgment by the Texas court should be disregarded in determining the Federal tax consequences of a trust instrument. More recently, the same issue was again presented to the Fifth Circuit in *Harris v. Commissioner,* and although the court was able to decide the case without passing on that question, it said:

Although for purposes of this case we assume without deciding that acts of a donor-taxpayer in a year subsequent to the year of a gift can affect the amount of gift tax liability for the year of gift, we note the existence of persuasive authority that as a matter of law the contrary is true and that not even a judicial reformation of a written instrument can operate to change the federal tax consequences of a completed transaction. * * * [461 F. 2d at 556 n. 2.]

Furthermore, the fact is that the Trigg trust has not been reformed, and at the date of his death, the decedent still had the power of revocation under Texas law. *Gaylord v. Commissioner,* 153 F. 2d 408 (9th Cir. 1946), affg. 3 T.C. 281 (1944). Hence, we conclude that the possibility of reformation must be disregarded in determining the effect of the Trigg trust instrument.

The petitioner's reliance on *Dodge v. United States,* 413 F. 2d 1239 (5th Cir. 1969), and *Margarita Touche,* 58 T.C. 565 (1972), is not justified. In the *Dodge* case, the taxpayer, in 1960, made a gift of land to a charitable organization. The taxpayer intended to give a one-fifth interest in the property each year for 5 years, but her attorney mistakenly prepared a deed to the entire premises. She deducted 20 percent of the value of the land in

1960 and 1961. The Commissioner argued that the entire gift was made in 1960 so that nothing could be deducted in later years. It was held that since the taxpayer could have reformed the erroneous deed under State law, the entire conveyance was not made in 1960. Likewise, in *Touche,* the taxpayer made a gift intending to take advantage of the $3,000 annual exclusion, but due to an error in drafting the gift deed, too much land was given. We held that since the taxpayer had the power to revest title in herself, no completed gift of the mistaken portion of the land was made.

In the *Dodge* and *Touche* cases, the possibility of reformation under local law was taken into consideration, but it was considered solely for the purpose of deciding whether completed gifts had been made. It was merely held that since the donors had the power to get back their gifts through a reformation proceeding in State court, no completed gift was made. These cases in no way support the petitioner's argument that the Federal tax treatment of the Trigg trust is altered by the possibility of reformation under State law. Here, any reformation of the trust instrument would seek to make irrevocable a gift which appears to be revocable. Although the decedent may not have intended the trust to be revocable, it was revocable at his death. Accordingly, we hold that the fair market value of the assets of the Trigg trust at the date of the decedent's death is includable in his gross estate. Sec. 2038(a)(1). In view of that conclusion, we need not consider the Commissioner's alternative argument that the gift in trust was made in contemplation of death.

The second issue which we must decide is whether the gift of the cottage to Chilton was made in contemplation of death. Section 2035 includes in the gross estate of a decedent gifts which he made within 3 years of his death and in contemplation of death. The primary purpose of section 2035 is to prevent evasion of Federal estate taxes by taxing inter vivos transfers which are substitutes for testamentary dispositions. *United States v. Wells,* 283 U.S. 102, 116-117 (1931).

Any gifts made within the 3-year period are presumed to have been made in contemplation of death (sec. 2035 (b)), but such presumption is rebuttable. If the petitioner can show that the inter vivos gift was not intended to be a substitute for a testamentary gift, then the dominant purpose of section 2035 is

not served by taxing the transfer. See *Berman v. United States*, 487 F. 2d 70 (5th Cir. 1973); *Bel v. United States*, 452 F. 2d 683, 687 (5th Cir. 1971), cert. denied 406 U.S. 919 (1972). In determining the reason for the gift, we must decide whether the dominant purpose in making the transfer was the thought of death or some purpose more clearly associated with life. *United States v. Wells, supra.* The determination of the dominant motive of a decedent requires an examination of all the facts and circumstances of the particular case. *Allen v. Trust Co.,* 326 U.S. 630, 636 (1946); see *Estate of Edward E. Ford,* 53 T.C. 114, 122 (1969), affd. per curiam 450 F. 2d 878 (2d Cir. 1971). Considering all the facts and circumstances of this case, we find that the gift of the cottage was not made in contemplation of death.

The decedent always intended to give the cottage to Chilton. Chilton and his family enjoyed and used the cottage much more frequently than the decedent or any other member of the decedent's family. The decedent always deferred to Chilton's wishes when any repairs or remodeling was done to the cottage and, on many occasions, said that the cottage was really Chilton's. Furthermore, the decedent had established a practice of making generous gifts to his children. He had made very large gifts to Chilton and Peggy in prior years, and the cottage, compared to those gifts, was not at all excessive or out of line with his practice. Compare *United States v. Wells, supra; Estate of Edward E. Ford, supra; Estate of Fletcher E. Awrey,* 5 T.C. 222 (1945); with *Estate of Sumner Gerard,* 57 T.C. 749, 760 (1972), affd. per curiam 513 F. 2d 1232 (2d Cir. 1975).

The gift to Chilton was not a substitute for a testamentary disposition. The decedent changed his will at the time of the gift to Chilton, but the changes in the will were completely unrelated to the gift of the cottage. In both the old and new wills, substantially all of the decedent's estate was divided equally among his three children, and in neither will was there any mention of the lake cottage. These circumstances lead us to conclude that the decedent always contemplated that the cottage would be given to Chilton during the decedent's lifetime. In addition, the gift of the cottage constituted a transfer of only a small portion of the decedent's estate; he owned cash, stock, notes, and securities worth over $646,000 when he died 7 months later. See *Estate of Edward E. Ford, supra.*

The Commissioner based his determination that the gift of the cottage was made in contemplation of death primarily on the decedent's age and the pending operation. However, we believe that while the pending operation may have been a catalyst in causing the decedent to make the transfer at that time, it was not the anticipation of death that caused the decedent to give the cottage away. The decedent's age and health are important considerations in determining the motives for a gift, but they are never conclusive. A very sick person can have a living purpose prompting his actions. See *Estate of Brigid Angela Casey*, 25 T.C. 707 (1956); *Estate of Fletcher E. Awrey, supra.*

In their briefs, both parties discussed the valuation of the bonds, but their only disagreement concerns the amount necessary to pay the Federal estate taxes. Both parties agree that to the extent that the bonds are used to pay the petitioner's Federal estate taxes, they are to be valued at face value. See *Bankers Trust Co. v. United States*, 284 F. 2d 537 (2d Cir. 1960), cert. denied 366 U.S. 903 (1961); Rev. Rul. 69-489, 1969-2 C.B. 172. Accordingly, we hold that the additional bonds used to pay the deficiency determined by us will be valued at face value; any balance of the bonds will be valued at their fair market value.

*Decision will be entered under Rule 155.*