ESTATE OF JAMES R. LOWE, DECEASED, CROCKER NATIONAL BANK, JAMES R. LOWE, JR., AND MARGOT H. LOWE, CO-EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8692-73.    Filed July 28, 1975.

*Bruce M. Casey, Jr., Darrell E. Williams, Robert W. Morrison,* and *James B. Atkin,* for the petitioners.

*John Gigounas,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in estate tax in the amount of $2,077,686. Concessions having been made, the sole issue remaining for our decision is whether a certain transfer in trust made by decedent James R. Lowe within 3 years of his death is includable in the decedent's gross estate as a transfer in contemplation of death within the meaning of section 2035.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

James R. Lowe (Lowe or decedent) died testate on December 19, 1969, at the age of 65. At the time of his death, Lowe was a resident of Belvedere, Calif. The address of the coexecutors (petitioners) of the decedent's estate was One Montgomery Street, San Francisco, Calif., at the time the petition was filed. The petitioners filed their Federal estate tax return (Form 706) with the District Director of Internal Revenue, San Francisco, Calif.

Lowe was born on April 5, 1904. He was survived by three children, all of whom were the issue of his marriage to Elizabeth Ives, the first of his three wives. This first marriage terminated in divorce on April 5, 1939.

Pursuant to the property settlement incident to the divorce, the decedent established four trusts each dated June 1, 1939, for the respective benefit of Elizabeth Ives and the three children—Susan Lowe Kilbourne, James R. Lowe, Jr., and Elizabeth Ives Lowe II. The decedent was obligated pursuant to the trust instruments to transfer to each trust cash and securities worth $100,000.

On August 15, 1939, Lowe married his second wife, Marion Somers. There were no children born of this marriage which terminated in divorce on January 4, 1965.

Lowe and his second wife entered into a property settlement on November 27, 1964, by which Lowe agreed to transfer cash and property worth $595,000 to his second wife. As part of the property settlement, equal remainder interests in certain Mexican property were transferred to Lowe's three children in

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.

1965. Each remainder interest was valued for gift tax purposes at $46,093.33.

In addition to the management of an investment portfolio, the decedent had a varied business career as the owner and operator of cattle ranches in California and Nevada, a part owner of a hotel in Mexico, and had interests in timber properties individually owned and as a partner through investments in timber-holding and lumber-processing companies.

From 1942 to 1948 the decedent acquired shares of Hill-Davis Co., Ltd., which company subsequently merged with Arcata National Corp. (Arcata). The decedent was a member of Arcata's board of directors from 1946 until he reached the mandatory retirement age of 65 in 1969.

Until sometime in 1962, Lowe's occupation was president of the Calaveras Land & Timber Co. During 1962 Lowe officially retired from his position.

In October 1962, the decedent acquired a stock interest in two Mexican corporations, the Playa de Oro and the Continental de Inversiones for $26,000. In the period from October 1962 through April 1964, he made loans to said corporations in the total sum of $99,000.

On July 10, 1963, the decedent acquired a 25-percent interest in a timber-holding partnership for an investment of $25,000.

In July 1964, the decedent purchased a 1,080-acre cattle ranch in Yerington, Nev., at a cost of $259,000. On August 21, 1964, he sold the ranch to a newly formed corporation, Keller Cattle Co., in which he owned one-half of the stock for which he paid $10,000. The ranch was sold to the corporation at the decedent's cost, the purchase price being payable in installments over a 20-year period.

At the time the Nevada ranch was purchased it was stocked with Hereford cattle. Shortly thereafter all of the Hereford cattle were sold and in December 1964, the decedent started to acquire Aberdeen Angus cattle to establish a breeding herd.

From December 1964 through June 20, 1968, 398 cows, 37 bulls, 133 calves, and 229 cows with calves in gestation were purchased for the new breed. The day-to-day operations of the ranch were managed by the resident foreman under the overall supervision of the decedent. Unexplained losses of cattle were discovered by the decedent's accountant approximately 2 months

before decedent's death and a civil action was filed by the estate of the decedent against the foreman for the losses sustained.

In connection with the operation of the cattle ranch in Nevada the decedent in December 1967, purchased grazing rights to 48,000 acres on Bureau of Land Management property for the sum of $37,000. In June of 1968, another grazing range became available from the Bureau of Land Management, and the decedent acquired grazing rights to an additional 27,000 acres at a cost of $13,500.

During 1965, decedent made four trips to his ranch at Yerington, Nev., and spent a total of approximately 17 days there. During 1966, decedent also made four trips to his ranch, spending approximately 11 days there. He made no trips to his ranch in 1967 or 1968, and one 2-day trip in December 1969.

In January 1965, Lowe sailed to London, England, and remained in Europe traveling through Italy, Yugoslavia, and France until his return voyage on May 21. In the spring of 1966, Lowe spent just over 2 months in Europe. The decedent again traveled to Europe in February 1967, and returned to this country in April, having spent most of his time in France. In September 1967, Lowe went grouse hunting in Scotland; in November, after a 2-year courtship, Lowe married his third wife, Margot Hawkins, whom he had known since 1940, and they left on their honeymoon to Hawaii, New Zealand, and other Pacific islands, returning in January 1968.

When at home Lowe and his third wife entertained guests weekly. He regularly attended meetings of Arcata's board of directors. He had a developed interest in sodium-restricted "gourmet" diets and wine, and in January 1969, submitted a manuscript on the subject to Dr. Chamberlain for medical criticism. On August 22, 1969, Lowe and his third wife began a cruise of the Greek islands. In September they traveled through Turkey, Hungary, and Austria, returning to San Francisco on October 9 via London, New York, and Washington, D. C.

Whenever Lowe was in Europe, he consulted physicians in England and France.

During the period 1965 through 1969, the decedent lived in Belvedere, Calif., a suburb of San Francisco. Decedent spent $194,000 in the acquisition, improvement, and furnishing of his home in Belvedere which he acquired in September 1965, following his divorce from his second wife. Lowe and his third

wife resided at this home and also maintained an apartment in San Francisco for occasional use.

The day he died, December 19, 1969, a proposed agreement was submitted to Lowe at his request for charter of a ship to cruise the Mediterranean Sea during August and September 1970.

Lowe died from arteriosclerotic and hypertensive heart disease. This condition was first diagnosed upon his admission to Franklin Hospital in San Francisco (Franklin Hospital) for observation on December 26, 1961. In November and December 1961, it had first appeared that Lowe was suffering from shortness of breath after only moderate exercise such as climbing one flight of stairs. In 1962, it was first noticed that Lowe also suffered from congestive heart failure, a complication of arteriosclerotic heart disease where the heart is unable to pump blood at a rate high enough to prevent clogging of the venous channels. Upon his release from the hospital on January 2, 1962, Lowe was placed on medication and a strict dietary regimen for treatment of his condition.

Dr. Arthur Storment (Dr. Storment), a specialist in internal medicine, was Lowe's personal physician, and Dr. Francis L. Chamberlain, a cardiologist, was called in as a consultant; both practiced in the San Francisco area. Both doctors thought Lowe should be allowed to lead an active life physically provided he did only those things which he could do in comfort. Dr. Chamberlain expected Lowe to do quite well.

In January 1963, decedent consulted Dr. Paul Dudley White (Dr. White), a cardiologist practicing in Boston, Mass., and had a complete physical examination at the Massachusetts General Hospital in Boston. The examination revealed that Lowe had an abdominal aneurysm. A surgeon, Dr. Robert Shaw, performed a successful operation for removal of the aneurysm.

On May 19, 1963, Lowe was again admitted to Franklin Hospital because of his heart condition. Dr. Chamberlain diagnosed Lowe's illness as a combination of emphysema and auricular fibrillation with a background of hypertension and hypothyroidism. Lowe's condition suggested to Dr. Chamberlain congestive heart failure and a pulmonary embolism. He recommended that Lowe be placed permanently on a digitalis medication to be taken daily for his heart condition, and that Lowe take continuous medication for hypertension. Lowe was

also to take medication continuously for high blood pressure and a diuretic for maintenance of a low salt level in his body. Occasionally he would take antibiotics for respiratory infection because of his emphysema. Lowe also suffered from gout and took medicine for this ailment. Lowe was discharged from the hospital on May 28, 1963. Thereafter, Lowe consulted with and was examined by Dr. Chamberlain on the following dates:

| | | |
|---|---|---|
| 8/8/63 | 6/7/66 | 4/3/68 |
| 9/3/63 | 8/1/66 | 5/29/68 |
| 8/31/65 | 10/4/66 | 7/30/68 |
| 9/14/65 | 11/8/66 | 9/30/68 |
| 10/7/65 | 12/10/66 | 11/13/68 |
| 11/23/65 | 2/15/67 | 1/6/69 |
| 1/24/66 | 5/25/67 | 1/10/69 |
| 1/31/66 | 8/16/67 | 4/29/69 |
| 2/8/66 | 10/30/67 | 7/28/69 |
| 3/3/66 | 2/20/68 | 10/28/69 |

In May 1965, Lowe again consulted Dr. White in Boston. He was advised that his heart rate of 100 was out of control and additional medicine was prescribed.

On August 2, 1965, Lowe was admitted to Franklin Hospital with a marked enlargement of his heart and congestive heart failure due to his arteriosclerotic heart disease. He was kept in the hospital until August 21, 1965, for rest, continued observation, and attempts to regularize his heartbeat.

After this third hospitalization for treatment of his heart condition, Lowe rigorously maintained his low salt, low fat diet, watched and recorded his weight each day, meticulously took his medications daily, and consulted frequently with his physicians. His life depended on his medications. His health stabilized, and, by the end of 1966, his physicians advised that he was doing fine and that his condition was much improved.

Nevertheless, the decedent continued to suffer from breathlessness upon very moderate exercise, and was warned by Dr. Chamberlain of the dangers of climbing more than occasionally any stairs beyond a maximum of one flight and was advised not to ascend beyond this level without using an elevator. Decedent had an elevator installed in his home, and he deducted the cost as a medical expense on his 1966 California State Income Tax Return. However, by the fall of 1969, Lowe was able to walk a mile.

Lowe's health remained stable from the fall of 1966 until his death in December 1969. He was hospitalized on only one occasion, in New Zealand during his honeymoon with his third wife in December 1967, for a low sodium state, an intestinal disease, and dehydration.

Lowe's personal attorney from 1951 until the decedent's death prepared 12 wills and codicils, numerous trusts and leases for Lowe, and gave legal advice concerning Lowe's divorce settlement with his second wife and his property holdings. During the years 1961 through 1968, his attorney prepared approximately eight trusts at Lowe's request. The first will that his attorney prepared for decedent was executed in January 1962, the same month in which the decedent's heart condition had been diagnosed.

During the period from January 29, 1962, through April 17, 1968, the decedent executed a total of 12 wills and codicils to wills as follows:

| Document | Date of execution | Document | Date of execution |
|---|---|---|---|
| Will | Jan. 29, 1962 | Codicil | Mar. 2, 1966 |
| Codicil | Aug. 30, 1962 | Will | Dec. 19, 1966 |
| Codicil | Jan. 14, 1963 | Codicil | Feb. 9, 1967 |
| Codicil | Apr. 22, 1964 | Codicil | Nov. 2, 1967 |
| Will | Jan. 8, 1965 | Codicil | Feb. 15, 1968 |
| Codicil | Feb. 7, 1966 | Will[1] | Apr. 17, 1968 |

[1] Copy of the will admitted to probate.

A trust was established by the parents of the decedent, Edward Lowe and Susan Blodgett Lowe, on December 18, 1924, the sole beneficiary of which was the decedent. As of September 30, 1966, the corpus of such trust consisted of cash in the sum of $551.81 and securities with an aggregate cost to the trust of $827,484.

During the 30-year period from 1936 to 1965, both inclusive, the decedent was the grantor of the following 13 inter vivos irrevocable trusts:

| Primary beneficiary | Date of execution |
|---|---|
| Grantor's daughter | June 24, 1936 |
| Grantor's son | June 14, 1937 |
| Butterworth Hospital | Dec. 29, 1938 |
| Grantor's first wife[1] | June 1, 1939 |
| Grantor's daughter[1] | June 1, 1939 |
| Grantor's daughter[1] | June 1, 1939 |
| Grantor's son[1] | June 1, 1939 |
| Grantor's second wife | Dec. 18, 1941 |
| Grantor's grandson | December 1960 |
| Grantor's granddaughter | Aug. 30, 1962 |

| Primary beneficiary | Date of execution |
|---|---|
| Grantor's grandson _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | Nov. 13, 1964 |
| Grantor's grandson _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | Aug. 1, 1964 |
| Grantor's grandson _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | Apr. 29, 1965 |

[1] Transfer in trust incident to divorce from first wife.

In 1947, the decedent gave $25,000 each to his daughter Susan Lowe Kilbourne and his son James Lowe, Jr., and $36,000 to his daughter Elizabeth Ives Lowe II. Thereafter, from 1948 through 1969, Lowe made 70 gifts of cash or other property, each gift being worth $6,000 or less, to his children or grandchildren. In 1965, in connection with the property settlement incident to his divorce from his second wife, equal remainder interests worth $46,093.33 each were given to each of his three children.

Lowe's accountant prepared a valuation report of decedent's assets as of September 30, 1966, which indicated that the decedent's total estate was worth $7,402,593.

On January 12, 1967, the transfer which is the subject of the instant case was made to an irrevocable, inter vivos trust created by the decedent. The trust beneficiaries were Lowe's unmarried daughter, Elizabeth Ives Lowe II, and his five grandchildren. The trust corpus consisted of 6,000 shares of common stock of Arcata with an aggregate value for gift tax purposes of $1,128,000.

On January 12, 1967, the decedent owned 11,051 shares of the 116,900 outstanding shares of common stock of Arcata. In the fiscal years ended June 30, 1966, and June 30, 1967, this corporation paid cash dividends of $5.20 a share. After June 30, 1967, and prior to the date of death of the decedent, such shares of stock were split twice: i.e., 9 to 1 and 4 to 1 thereby increasing the number of shares held by this trust to 216,000 shares. No portion of the corpus of this trust was included in the gross estate on the decedent's estate tax return.

The five grandchildren, each of whom survived the decedent and are beneficiaries of such trust, are:

William Truman Kilbourne II
(born Mar. 5, 1960);

Laura Ives Kilbourne
(born May 28, 1962);

Thomas Lowe Kilbourne
(born June 28, 1964);

James Roland Lowe III
(born Feb. 29, 1964); and

Edward Garrett Lowe
(born Apr. 29, 1965)

The decedent was also survived by a sixth grandchild, Elizabeth McIntyre Lowe, not a beneficiary of the trust, who was born March 14, 1969.

The will that Lowe executed on December 19, 1966, contained a residuary testamentary trust, the beneficiaries of which were the decedent's grandchildren and his surviving children without living issue.

On February 9, 1967, Lowe executed the first codicil to his will of December 19, 1966. By it he provided that any children born to his then married son or married daughter after the creation of the January 12, 1967, inter vivos trust would be first entitled to a share of the testamentary trust corpus equal in value to a distributive share of the inter vivos trust. This share was to be set aside from the testamentary trust corpus prior to the corpus being divided into shares among all the beneficiaries. This codicil was prepared specifically because the inter vivos trust did not provide for after born grandchildren.

The January 12, 1967, transfer in trust was part of an overall testamentary disposition of the decedent's estate.

Lowe's death on December 19, 1969, came suddenly and without warning. He was hospitalized with abdominal pains that his personal physician Dr. Storment, who treated Lowe during his last illness, at first thought was a gall bladder problem. In fact, due to his arteriosclerotic and hypertensive heart disease, the decedent's heart had deteriorated to the point where it was unable to nourish either his liver or his intestine, both of which ceased functioning because of lack of blood.

The coexecutors of the decedent's estate elected to value the gross estate as of the alternate valuation date, December 19, 1970. As of December 19, 1970, the estate of the decedent owned 101,800 shares of the common stock of Arcata; the inter vivos trust created by the decedent on January 12, 1967, owned 216,000 shares of such stock on the alternate valuation date. The parties have agreed that if we decide that the January 12, 1967, transfer in trust by the decedent constituted a transfer in contemplation of death, then the gross estate of the decedent will be increased as follows:

| Description | Increase in the gross estate |
|---|---|
| The 101,800 shares of the common stock of Arcata National Corp. owned by the decedent's estate shall be found to have had a fair market value as of Dec. 19, 1970, of $14.735625 a share and an aggregate fair market value of $1,500,086.62 _____ | $30,349.12 |
| The 216,000 shares of Arcata National Corp. constituting the assets of the Jan. 12, 1967, trust, shall be found to have had a fair market value as of Dec. 19, 1970, of $14.735625 a share and an aggregate value of $3,182,895_____ | 3,182,895.00 |

As an ultimate finding of fact, we find that the transfer in trust made by decedent on January 12, 1967, was a transfer in contemplation of death within the meaning of section 2035.

### OPINION

On January 12, 1967, less than 3 years prior to his death, Lowe transferred 6,000 shares of Arcata common stock with an aggregate value of $1,128,000 to an irrevocable, inter vivos trust, the beneficiaries of which were the decedent's unmarried daughter and his five grandchildren. Whether this transfer was made in contemplation of death within the meaning of section 2035 [2] depends upon the dominant motive of the decedent which we must determine on the basis of all the facts and circumstances. *Allen v. Trust Co.*, 326 U.S. 630 (1946); *Estate of Edward E. Ford*, 53 T.C. 114 (1969), affd. per curiam 450 F.2d 878 (2d Cir. 1971). A rebuttable presumption in respondent's favor exists under the statute. Sec. 2035(b);[2] *Estate of Maurice H. Honickman*, 58 T.C. 132, 135 (1972), affd. without opinion 481

---

[2] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer * * *, by trust or otherwise, in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3 years ending with the date of his death * * * transferred an interest in property, * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *; but no such transfer * * * made before such 3-year period shall be treated as having been made in contemplation of death.

F.2d 1399 (3d Cir. 1973); *Cleveland Trust Co. v. United States*, 421 F.2d 475 (6th Cir. 1970).

A careful review of the record in the instant case convinces us that the transfer was a substitute for testamentary disposition, and that the thought of death was the impelling cause of the transfer. *United States v. Wells*, 283 U.S. 102 (1931); *Estate of Oliver Johnson*, 10 T.C. 680 (1948).

From 1962 until he died Lowe was an unhealthy man suffering from, inter alia, heart disease, hypertension, and emphysema.

We agree that Lowe's restricted diet, extensive medication, and frequent consultations with his doctors do not necessarily indicate that he entertained thoughts of death which impelled him to make the transfer. However, during the years of treatment for his heart disease, Lowe's activities must be judged against a background of frail health that after the fall of 1966 stabilized until his death in December 1969.

Relying on medical reports of Lowe's health in 1968 and 1969, petitioners attempt to portray the image of a man well on his way to recovery. Although the record indicates that by the fall of 1969 the decedent could walk a mile, it also indicates that at the time of the transfer in January 1967, he could not climb more than one flight of stairs without becoming breathless. Moreover, Lowe's cardiologist had advised him that because of his heart condition, it was medically dangerous for him to climb even one flight of stairs more than occasionally.

In October 1969, Lowe's cardiologist reported him to be "feeling quite well" and that having returned from a recent trip to Greece and Turkey, he was "remarkably free of cardiovascular complaints." These statements must be taken in the context of his generally poor, though stable, health, and his death 2 months later from a diseased heart that had deteriorated to the point where it could no longer supply blood to his vital organs.

In determining the motive impelling the subject transfer, we are concerned most with Lowe's bodily and mental condition near the time of that event. *Estate of Sumner Gerard*, 57 T.C. 749, 758 (1972), affd. per curiam 513 F. 2d 1232 (2d Cir. 1975); *United States v. Wells, supra.*

Lowe's doctors' medical reports and correspondence on his health around the time of the transfer of January 12, 1967, record an improved state of health since his last previous hospitalization for congestive heart failure in August 1965.

However, we do not think these reports speak as optimistically as petitioners would have us think. Lowe's health had "improved" since March 1966, when he was advised by his cardiologist that "it is important to appreciate your margin of safety is narrow." After his hospitalization in August 1965, Lowe was admitted to the hospital once more before his death, for a low sodium state, intestinal disease, and dehydration in December 1967, while in New Zealand on his honeymoon with his third wife.

In January 1962, Lowe executed the first of 12 wills and codicils that his personal attorney from 1951 until Lowe's death, prepared for him. Earlier that same month, Lowe's heart disease had been first diagnosed. From January 1962 through February 1967, Lowe changed his will or executed a new one nine times. This evidence indicates to us that upon discovery of his heart condition, decedent's thoughts turned periodically to the devolution of his estate. The evidence also indicates to us that his thoughts were turned in this direction at the time of the transfer at issue. See *Estate of Maurice H. Honickman*, 58 T.C. 132 (1972), affd. without opinion 481 F. 2d 1399 (3d Cir. 1973).

On December 19, 1966, Lowe executed a will leaving the residue of his estate to a testamentary trust, the beneficiaries of which were the decedent's grandchildren and his surviving children without issue. In examining the will of December 19, 1966, the trust instrument of January 12, 1967, and the codicil of February 9, 1967, amending the will of December 19, 1966, we must conclude that the transfer at issue was an integrated part of a testamentary plan of disposition of Lowe's estate.

Decedent was survived by three children who were the issue of his first marriage, and by six grandchildren, three of whom were the issue of his married son and three of whom were the issue of his married daughter. Lowe's other surviving child, a daughter, was never married and was without issue.

The January 12, 1967, transfer in trust constituted gifts to his five grandchildren and his unmarried daughter aggregating in value $1,128,000. Lowe's sixth grandchild was born on March 14, 1969, after the creation of the trust.

The beneficiaries of the inter vivos trust were also beneficiaries of the residuary testamentary trust under the will of December 19, 1966. Of course, the class of beneficiaries under the testamentary trust was open. However, the inter vivos trust was irrevocable, and Lowe did not have the power to add to its

beneficiaries. Thus, when Lowe's sixth grandchild was born, she was not a beneficiary of the inter vivos trust, but she was a beneficiary of the testamentary trust.

The codicil of February 9, 1967, amending the will of December 19, 1966, in effect provided that his sixth grandchild would be first entitled to a share of the residuary testamentary trust corpus equal in value to a distributive share of the inter vivos trust. This codicil was executed solely in order to provide that any of Lowe's grandchildren born to his married son or married daughter after the creation of the inter vivos trust would share his wealth, including the value of the inter vivos trust corpus, equally with his grandchildren who were beneficiaries of the inter vivos trust. This is not simply a case where there exist parallel provisions in a will and a trust instrument executed close in time. See *Cleveland Trust Co. v. United States*, 421 F. 2d 475 (6th Cir. 1970); *Estate of Maurice H. Honickman, supra.* Here, a third document, the codicil amending the December 19, 1966, will, was prepared in effect to bind the dispositive provisions of the testamentary trust together with the distributive shares of the inter vivos trust, and thereby, to assure Lowe that his grandchildren would each receive a substantially equivalent share of his wealth at his death. We think Lowe saw the gifts in trust transferred on January 12, 1967, as part of the plan to dispose of his estate among his heirs, and as a substitute for a testamentary disposition of the stock which constituted the corpus of the inter vivos trust.

Furthermore, though Lowe's unmarried daughter received the present benefit of her share (one-third) of the trust income, if she were to have issue, then her right to income would cease and her share of income would be accumulated for the benefit of her issue until the eldest attained the age of 21. Lowe's unmarried daughter had no interest in the corpus of the trust except for payment, in the trustee's sole discretion and so long as she had a right to income, of extraordinary medical expenses. Lowe's grandchildren had no rights to income or corpus during minority even for extraordinary medical expenses. Cf. *American Fletcher Nat. Bank & Trust Co. v. United States*, 441 F. 2d 470 (7th Cir. 1971).

The will which was admitted to probate was executed by Lowe on April 17, 1968. It changed a number of provisions contained in Lowe's December 19, 1966, will as modified by the February 9,

1967, codicil. Inter alia, the April 17, 1968, will did not contain the special share to be separated out from the corpus of the residuary testamentary trust for grandchildren born after the January 12, 1967, transfer, and Lowe's third wife, Margot Hawkins Lowe, was named an income beneficiary of the testamentary trust. Nevertheless, these later will changes are irrelevant to a determination of the impelling motive behind the January 12, 1967, transfer. The question of motive involves the state of mind and body of the donor near the time of the transfer, not more than 1 year later. *United States v. Wells, supra; Estate of Sumner Gerard,* 57 T.C. 749, 758 (1972).

Although the decedent had a long history of generosity with his family, no previous gift approached the size of the transfer at issue. Moreover, his largest previous gifts were in connection with his first two divorces. In 1939 the decedent transferred $400,000 in trust for each of his three children and his first wife ($100,000 to each trust) pursuant to the property settlement incident to his divorce. In connection with his divorce from his second wife in 1965, the decedent's three children each received equal remainder interests in Mexican property valued at $46,093.33 each for gift tax purposes. In 1947, Lowe gave $25,000 to two of his children and $36,000 to the third, the daughter who never married. Although from 1948 through 1968 Lowe made a total of 70 gifts to his children and grandchildren in addition to the transfer at issue and the gifts in connection with his divorce in 1965, none of these exceeded $6,000 in value. On these facts, it seems clear to us that decedent's transfer of $1,128,000 in January 1967, was not part of a previous pattern of giving. See *United States v. Wells, supra; Allen v. Trust Co., supra; Estate of Edward E. Ford, supra.*

Petitioners postulate two life-connected motives as impelling Lowe's transfer in trust of January 12, 1967. We are not convinced by either of them.

The first was testified to by the decedent's third wife and widow, Margot Hawkins Lowe. She testified that the decedent told her in January 1967, that he was making the transfer in trust to avoid potential conflict with his family over his forthcoming marriage with her. Although the decedent may have told her this, we do not believe that he revealed his true motives to her. She testified that Lowe had never discussed the size of his estate with her; in spite of the fact that he had known her since

1940 and had been courting her for a year, she testified that he had never discussed with her the past problems in his two previous marriages that led to divorce. We do not believe that Lowe's relationship with Margot Hawkins in January 1967, was such that Lowe would have disclosed to her his motives for making the $1,128,000 transfer at issue. Moreover, Lowe's personal attorney who prepared the trust instrument as well as the December 19, 1966, will and codicil thereto of February 9, 1967, testified by way of deposition that though Lowe mentioned the possibility of remarriage generally to him, Lowe never spoke specifically of marrying Margot Hawkins.

No evidence was adduced to show that Lowe's family disapproved of his relationship to Margot Hawkins or that they were the least bit upset over his desire to marry her. Under such circumstances and absent other evidence that Lowe thought there was a potential conflict brewing with his family over his plans to marry, we cannot find that this alleged avoidance of family conflict played any part in his decision to make the transfer at issue. Compare *Gillette's Estate v. Commissioner*, 182 F. 2d 1010 (9th Cir. 1950), revg. a Memorandum Opinion of this Court.

The second life motive which petitioners seek to ascribe to Lowe's transfer in trust of January 12, 1967, is that because he was then considering both remarriage and the attendant possibility of its termination by divorce, Lowe wanted to provide for his unmarried daughter and his grandchildren so that their needs would be met without reliance upon decedent after another divorce.

Having gone through two divorces, the last only 2 years before the transfer at issue, we do not doubt that such a question weighed on Lowe's mind in his consideration of remarriage. However, we do not think that such was the dominant motive behind the transfer at issue.

We note, first, that Margot Hawkins did not consent to marry Lowe until November 1967. Second, a valuation report of the decedent's assets as of September 30, 1966, prepared by his accountant, showed Lowe's estate to be worth approximately $7,402,000. This was almost 2 years after Lowe had entered into the property settlement in connection with his divorce from his second wife. By that settlement he transferred cash and property to her worth $595,000. Though costly, it can hardly be said that

the settlement depleted decedent's estate. Moreover, in connection with that settlement, decedent's three children each received an equal remainder interest in certain Mexican property valued at $46,093.33 for gift tax purposes. In connection with Lowe's divorce from his first wife in 1939, each of Lowe's three children had received cash and securities in trust worth $100,000. Petitioners presented no evidence demonstrating the kind or extent of the needs of Lowe's grandchildren and unmarried daughter or of their financial dependence upon decedent. Nevertheless, we are unwilling to say that his concern about the possibility of divorce even before remarriage played no part in motivating Lowe to make the transfer at issue. However, we are certain on the facts presented that it was not the impelling motive for the transfer.

From the breadth of Lowe's investments and business interests, the number of trips he took abroad and in this country, and the absence of specific restrictions by his physicians on his social and business affairs, petitioners would have us conclude that the transfer at issue could not have been motivated by thoughts of death. Petitioners argue that "the entirety of the evidence paints a picture of a donor with a cheerfully optimistic attitude with respect to not only his own health but his life in general." Even if this were so, it would be only one factor to consider and it would not necessarily speak to the specific motivations behind Lowe's January 12, 1967, transfer. See *Estate of Jacob Gidwitz*, 14 T.C. 1263 (1950), affd. 196 F. 2d 813 (7th Cir. 1952).

Except for his cardiologist's warning not to ascend more than one flight of stairs without using an elevator, and except for constant medication and dietary restrictions, it is true that Lowe's doctors did not specifically restrict his business or social activities. It is also true that Lowe's doctors recognized in January 1962, that Lowe would be able to engage in only those activities which would not cause him discomfort. Thus, his poor health imposed its own restrictions on his activities.

We conclude from the record that Lowe's health was a matter of some concern to him. When in Europe, Lowe sometimes consulted cardiologists in England and France. During the spring of 1966, though his trip to Europe was only of 2 months' duration, Lowe sent reports of his health to his cardiologist in San Francisco. On other trips there is no evidence of

correspondence with his doctors while abroad, but neither is there evidence that his concern for his health diminished.

There is no evidence in the record which gives us an understanding of the extent of Lowe's personal involvement in his business and investment affairs. There is no indication of the frequency of the Arcata board of directors meetings or of the nature of Lowe's participation in them. There is no evidence that would allow us to conclude that his responsibilities as a director required more of him than attendance at board meetings.

Regarding his ranch in Yerington, Nev., Lowe delegated its management to a resident foreman. He spent little time at the ranch, and there is no evidence even to support a conclusion that the trips which he did make there were for business reasons. It was Lowe's accountant who discovered unexplained losses of cattle from the ranch 2 months before Lowe died. The civil action against the foreman for losses sustained was filed by the estate.

With respect to his other business interests, the evidence in the record shows only sums loaned to or amounts invested in named interests on given dates. We conclude from the evidence that Lowe's business affairs involved little more than passive investment after his retirement in 1962 at the age of 58 from his position as president of the Calaveras Land & Timber Co.

His trips abroad and his activities as an investor may indicate that Lowe was neither willing nor expecting to give up the ghost, but a transfer may be made in contemplation of death without the transferor apprehending that death is near at hand. *United States v. Wells, supra;* sec. 20.2035-1(c), Estate Tax Regs.; *Estate of Jacob Gidwitz, supra.* We think that such is the case here.

Lowe was in poor health. The number of wills and codicils that he executed from January 1962 through February 1967, show he had concern over the devolution of his estate that was not evidenced prior to the discovery of his heart condition. The February 9, 1967, codicil interwove into a single testamentary plan the testamentary trust provisions of the December 19, 1966, will and the provisions of the inter vivos trust of January 12, 1967. There is no evidence that we find convincing of a clear life-connected motive impelling the transfer at issue. The amount transferred was not a part of a previous pattern of giving. On the basis of our close examination of all the facts and circumstances

in the record, we hold that the transfer in trust of January 12, 1967, was a transfer in contemplation of death within the meaning of section 2035, *supra,* and is includable in the decedent's gross estate.

*Decision will be entered under Rule 155.*