ESTATE OF HOWARD F. CARLSTROM, DECEASED, BETTY J. CARLSTROM, EXECUTRIX, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1143–79.     Filed January 28, 1981.

*Lon E. Mathews* and *James C. Moloney,* for the petitioner.
*William E. Bogner,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency of $14,954.54 in the Federal estate tax of petitioner, subject to the credit for State death taxes paid. The sole issue for decision is whether the gross estate of decedent should include the proceeds of an insurance policy on the life of decedent.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Decedent Howard F. Carlstrom died on March 25, 1975. His widow, Betty J. Carlstrom (hereinafter referred to as Betty), was named executrix of his estate. At the time she filed the petition herein, Betty resided in Chesterfield, Mo. On December 29, 1975, she filed the Federal estate tax return for this estate with the District Director of the Internal Revenue Service in St. Louis, Mo.

On the date of his death and for a period of at least 3 years prior thereto, the deceased was employed as president of Carlstrom Foods, Inc. (hereinafter CFI). On December 1, 1972, at a meeting of the officers of CFI it was approved that CFI would "take care of the premiums" on a life insurance policy for the deceased "in lieu of an increase in salary." At that time, the deceased owned approximately 20 percent of CFI stock. The other owners of CFI stock were the decedent's mother (31 percent), the decedent's brother (20 percent), and Francis Droesch (28 percent). Betty, with the assistance of Stan Towerman, CLU, an independent insurance agent (hereinafter sometimes referred to as Towerman), motivated the deceased to seek the insurance and the payment of its premiums by CFI.

On December 25, 1972, Betty applied to the Phoenix Mutual Life Insurance Co. of Hartford, Conn. (hereinafter Phoenix), for a $100,000 "employer pay all" split-dollar life insurance policy on the life of the deceased. This application was signed by the deceased, as insured, and Betty, as purchaser. Betty was also the named first owner of the policy and the primary beneficiary. Along with the application, Betty tendered a check drawn on the account of CFI for $600. A "temporary insurance receipt" was

made out to Betty but was kept by Stan Towerman in his files. Expert testimony revealed that had the deceased died the very next day, Phoenix would have been obligated to pay the insurance proceeds according to the terms of the application.

By memorandum dated January 11, 1973, Phoenix asked Stan Towerman to provide it with additional information so that the split-dollar amendent could be prepared. This memorandum stated certain assumptions with respect to which Phoenix sought confirmation. Among these was "that the wife, while living, and after her death, the insured, is to have the right to change the bene[ficiary]" of the proceeds not payable to CFI. Towerman responded, inter alia, that only the wife was to have the right to change the beneficiary at all times.

Towerman was notified, via a memorandum from Phoenix dated February 2, 1973, that the application for insurance on the life of decedent was approved and that he would be receiving the policy soon. On February 19, 1973, Towerman delivered the policy to the decedent at the offices of CFI. Accompanying the policy was a request to amend the policy. It provided in pertinent part:

> Said Company is hereby requested to amend the application for the above numbered policy so that the owner of said policy shall be as provided in the following Ownership Provision.

### OWNERSHIP PROVISION

> Subject to the following limitations the owner of this policy shall be Carlstrom Foods, Inc., a Missouri corporation, its successors or assigns.
>
> The printed provisions of this policy are hereby amended so that the owner shall not have the right to change the beneficiary designation and so that Betty J. Carlstrom, wife of the insured, while living, and after her death, Howard Carlstrom, the insured, shall have the right to change any beneficiary not designated as irrevocable. Notwithstanding this amendment, any assignment, release or surrender of this policy by the owner shall operate to the extent thereof to assign, release or surrender the interest of all beneficiaries or owners as provided in the printed provisions of said policy.
>
> All other "RIGHTS OF OWNER" as defined in said policy may be exercised by the owner without the consent of any other party.

> \* \* \* \* \* \* \*
>
> Said Company is hereby requested to amend the application for said policy so that the beneficiary designation of said policy shall be as provided in the following Special Settlement Agreement.

## SPECIAL SETTLEMENT AGREEMENT

The amount payable on account of the death of the insured shall be payable to Carlstrom Foods, Inc., a Missouri corporation, its successors or assigns, as irrevocable beneficiary, up to but not in excess of a sum equal to the premiums for this policy which shall have become due and been paid at the time of the insured's death, decreased by any indebtedness against the policy and by any amount paid from the death benefit to a collateral assignee or, if greater, the tabular cash value of the policy (as determined from the TABLE OF NONFORFEITURE AND LOAN VALUES) as of the end of the policy year in which the death of the insured occurs, increased by the value of any dividends or by the reserve under any additional insurance purchased by dividends as of the date of death of the insured, and decreased by any indebtedness against the policy and by any amount paid from the death benefit to a collateral assignee, and the balance, if any, shall be payable to:

Primary: Betty J. Carlstrom, wife of the insured

This amendment was executed on February 19, 1973, by the decedent, as insured and as president of CFI, and by his brother, H. Craig Carlstrom, as vice president of CFI. It was witnessed by Stan Towerman. It was also endorsed by two officers of Phoenix. Betty's signature does not appear on the amendment. In fact, Betty has never seen the amendment nor has she ever authorized or consented to its contents.

The decedent died suddenly at the age of 49 years on March 25, 1975, of a heart attack while on vacation in Jamaica. He was an athletic individual, participating regularly in tennis and swimming. Prior to his death there was nothing to indicate that the decedent was in other than excellent health. In addition to his spouse, he was survived by four sons. At the time of his death, the decedent owned approximately 71 percent of the stock of CFI.

Following the death of the decedent, Phoenix issued one check to CFI in the amount of $9,423.23, representing the total premiums paid by CFI for the policy, and one check to Betty in the amount of $99,611.73, representing the balance payable under the insurance policy in issue. These payments were made on or about May 13, 1975.

In the Federal estate tax return (Form 706) for the estate of the decedent, filed December 29, 1975, the $99,611.73 proceeds of the Phoenix policy paid to Betty were not included in the

amount reported as the decedent's gross estate. In his notice of deficiency, respondent determined that this amount[1] should have properly been included in the decedent's gross estate.

## OPINION

Respondent alleges that the life insurance at issue is includable in the decedent's gross estate pursuant to sections 2042[2] and 20.2042–1(c)(6), Estate Tax Regs., or, in the alternative, pursuant to section 2035.

We will first address ourselves to the question of includability of the life insurance proceeds under section 2042, which provides in pertinent part:

SEC. 2042. PROCEEDS OF LIFE INSURANCE.

The value of the gross estate shall include the value of all property—

(1) RECEIVABLE BY THE EXECUTOR.—To the extent of the amount receivable by the executor as insurance under policies on the life of the decedent.

(2) RECEIVABLE BY OTHER BENEFICIARIES.—To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. * * *

The regulations under section 2042 discuss the effect of insurance policies on the life of a decedent which are owned by a corporation controlled by the decedent. They provide, in relevant part:

Sec. 20.2042–1. Proceeds of life insurance.

(c) *Receivable by other beneficiaries.*

\* \* \* \* \* \* \*

(6) In the case of economic benefits of a life insurance policy on the decedent's life that are reserved to a corporation of which the decedent is the sole or controlling stockholder, the corporation's incidents of ownership will not be attributed to the decedent through his stock ownership to the extent the proceeds of the policy are payable to the corporation. * * * if any part of the proceeds of the policy are not payable to or for the benefit of the corporation, and thus are not taken into account in valuing the decedent's stock holdings in

---

[1]The amount stated in respondent's notice of deficiency, as proceeds properly includable in decedent's gross estate, is actually $99,612.73. Respondent has, however, stipulated, and therefore conceded, that the correct amount sought to be included in decedent's gross estate is $99,611.73.

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.

the corporation for purposes of section 2031, any incidents of ownership held by the corporation as to that part of the proceeds will be attributed to the decedent through his stock ownership where the decedent is the sole or controlling stockholder. * * * For purposes of this subparagraph, the decedent will not be deemed to be the controlling stockholder of a corporation unless, at the time of his death, he owned stock possessing more than 50 percent of the total combined voting power of the corporation. * * *

The validity of this regulation has been upheld in this Court and we have applied it with retroactive effect. *Estate of Dimen v. Commissioner*, 72 T.C. 198, 203 and n. 8 (1979); *Estate of Levy v. Commissioner*, 70 T.C. 873, 878–879 (1978).

It is the respondent's position that CFI was the owner of the Phoenix life insurance policy on the life of the decedent and that the incidents of ownership specified in said policy[8] should be attributed to the decedent through his ownership of approximately 71 percent of the CFI stock on the date of his death.

Petitioner asserts that Betty, not CFI, was the owner of the insurance policy and that as such CFI held no incidents of ownership which could be attributed to the decedent.

Both parties agree that the crucial question is whether the amendment to the policy is valid as a matter of State law.

Under the law of Missouri, "insurance is a matter of contract and is governed by the principles applicable to contracts." *Galemore v. Haley*, 471 S.W.2d 518, 523 (Mo. App. 1971). For there to be a contract at all, there must be a definite offer and an unequivocal acceptance. *Coffman Industries, Inc. v. Gorman-Taber Co.*, 521 S.W.2d 763, 769 (Mo. App. 1975). An application for insurance is an offer which may be accepted or rejected by the insurance company. *Summers v. Prudential Insurance Co. of America*, 337 S.W.2d 562, 565 (Mo. App. 1960); *Neuner v. Gove*, 133 S.W.2d 689, 694 (Mo. App. 1939). When an insurer sends a different policy than that applied for it is deemed to have made a counter offer. *Neuner v. Gove, supra.* However, one cannot be held to have accepted a counter offer without notice of it. *Suburban Realty Co. v. Sturgeon*, 443 S.W.2d 7, 12 (Mo. App. 1969). It should be noted, however, that acceptance of an insurance policy which differs from the application without prompt objection constitutes acceptance of the policy or counter

---

[8]Petitioner does not dispute that the policy contained incidents of ownership sufficient, if attributable to the decedent, to require inclusion of the proceeds in his gross estate.

offer. *Kap-Pel Fabrics, Inc. v. R. B. Jones & Sons, Inc.*, 402 S.W.2d 49, 57 (Mo. App. 1966), citing *Neuner v. Gove*, 133 S.W.2d 689, 694 (Mo. App. 1939). This rule applies whether or not the applicant has actually read the policy. *Kap-Pel Fabrics, Inc. v. R. B. Jones & Sons, Inc., supra.*

Respondent argues that Betty's acceptance of the policy without objection constitutes an acceptance of the variant terms contained therein. Petitioner, on the other hand, maintains that the amendment to the policy is void and of no legal effect since it was not approved by the applicant, Betty. Furthermore, petitioner asserts that since the policy applied for by Betty did in fact come into existence prior to February 19, 1973, when the policy was delivered to CFI, and before the execution of the amendment, she owned all rights in the policy which could not be altered by the unilateral actions of Phoenix in conjunction with third-party strangers to the contract. Based upon the facts presented, we find petitioner's analysis to be correct.

The policy of life insurance was clearly effective prior to the execution of the amendment. Sometime between February 2, 1973, and February 19, 1973, Betty was notified that the policy was in effect. Additionally, the policy was delivered prior to the presentation of the amendment. Furthermore, the language of the amendment, itself, indicates that the policy was already in effect. The execution of an amendment to a contract by a stranger thereto is of no legal effect. Therefore, the correct construction of the contract of insurance is that it was issued pursuant to the application as executed by Betty (which was part of the insurance policy and attached to it) providing that Betty shall be the owner of the policy. The policy, by its terms, provides that all incidents of ownership shall be held by the owner of the policy.

Although it is true that, under Missouri law, failure to object to the variant terms of an insurance policy constitutes an acceptance of them (*Neuner v. Gove, supra* ), this rule is not applicable to the facts of the instant case. First, as we have construed the contract of insurance, it contains no variant terms since it was issued pursuant to the application, and the amendment was ineffective. Second, we do not believe that the rule announced in *Neuner v. Gove, supra*, can reasonably be considered applicable to a variation which so blatantly defeats the intent of the parties and strips a party to the contract of all of

her rights thereunder, including her status as a party to the contract. To hold otherwise would be contrary to the general principle, adhered to in Missouri and elsewhere, that, where there is an ambiguity in the construction of an insurance contract, the construction most favorable to the insured will be adopted. *Aetna Life Ins. Co. v. Meyn*, 134 F.2d 246, 249 (8th Cir. 1943).

Respondent also asserts that the printed provisions of the policy, absent the amendment, cause ownership to rest with CFI. We disagree. The front page of the policy states "owner as provided in ownership provision attached hereto." The provision referred to is the amendment determined by this Court to be void. The only other reference in the policy to the owner is the original application attached to, and made part of, the policy. The original application unequivocally provides that Betty is to be the owner of the policy.

Respondent also relies on the provision in the policy which states that "the owner is the party who controls [the] policy while the insured is living." It is respondent's assertion that CFI controlled the policy during the decedent's life. While it is true that CFI had possession of the policy, it is equally true that Betty controlled it. The ownership paragraph of the policy stated that the designated owner, alone, had the power to exercise all ownership rights provided in the policy. This person was Betty. The fact that CFI may have thought it owned the policy is irrelevant. Likewise, it is irrelevant that Betty never exercised any of her rights under the policy. The relevant fact is that she had the power to exercise such rights and CFI did not. Thus, on the basis of the above discussion, we find that CFI, and consequently the decedent, held no incidents of ownership over that portion of the proceeds paid to Betty as beneficiary.

We next consider respondent's alternative argument that, even if Betty owned the policy, the proceeds payable to Betty should be included in the gross estate of the decedent pursuant to section 2035, which in 1975 provided:

SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3

years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.

In order for section 2035 to be invoked, two elements must be present—a transfer from the decedent within 3 years of death and a non-life motive for the transfer. First, we will assume that the decedent made a completed transfer of the policy on its effective date, and address the question whether such transfer was made in contemplation of his death.

Resolution of this issue depends upon the dominant motive of the decedent, determined on the basis of all of the facts and circumstances presented. *Allen v. Trust Co.*, 326 U.S. 630 (1946); *Estate of Hill v. Commissioner*, 64 T.C. 867 (1975); *Estate of Ford v. Commissioner*, 53 T.C. 114 (1969), affd. per curiam 450 F.2d 878 (2d Cir. 1971). See also *Estate of Lowe v. Commissioner*, 64 T.C. 663 (1975). The primary purpose of section 2035 is to prevent evasion of Federal estate taxes by taxing lifetime transfers which are no more than substitutes for testamentary dispositions. *United States v. Wells*, 283 U.S. 102, 116–117 (1931); *Estate of Hill, supra* at 877. There exists a rebuttable presumption under section 2035 that gratuitous transfers within the 3-year period prior to death were made in contemplation of death. Sec. 2035(b); *Estate of Honickman v. Commissioner*, 58 T.C. 132, 135 (1972), affd. 481 F.2d 1399 (3d Cir. 1973). It is the petitioner's burden to overcome this presumption. Rule 142(a), Tax Court Rules of Practice and Procedure. This burden is made even more difficult in the instant case due to the nature of the property transferred, i.e., a life insurance policy which is inherently death oriented.

Petitioner must show that the transfer of the policy was not intended as a substitute for a testamentary disposition, and thus that the purpose of section 2035 would not be served by taxing the transfer. See *Berman v. United States*, 487 F.2d 70 (5th Cir. 1973); *Estate of Hill v. Commissioner, supra.* In determining whether the transfer was in contemplation of death, we must decide if the decedent's dominant purpose and motive in making

the transfer was more closely associated with the thought of death or considerations related to life. *United States v. Wells, supra.* Upon a review of all of the facts and circumstances presented, we find that the transfer by the deceased of the life insurance was not made in contemplation of his death.

First, the deceased made the transfer at 47 years of age. At that time, and for his entire married life, he had been in excellent health. In fact, only once since he was married in 1946 had the decedent been hospitalized, and that was for knee surgery necessitated by a basketball injury. Furthermore, the decedent was an extremely athletic individual, regularly playing tennis and swimming right up until his death. His sudden heart attack resulting in death, while on vacation in Jamaica, was totally without warning. Although the state of one's health is not determinative that a transfer was made with life motives, it is good evidence in support of such a finding. *Estate of Ford v. Commissioner, supra* at 123.

Second, the motivating force behind the decedent's acquisition of the policy was his wife, Betty. Her very credible testimony revealed that she became very concerned about her future financial security when a friend's husband died unexpectedly:

I had a friend, and it was the first one of our acquaintances, whose husband had passed away. They were older than we were. And, she lost almost everything she had because he hadn't had a proper will, hadn't had enough liquid finances, and she lost, I think, everything but her home. And she said, if I don't do anything else, I'm going to warn all my friends that they take care of the will, and that they get as much insurance as they can, to take care of themselves and their family. And I prompted Howard to—in fact, I guess you'd say, nag, that's what he might have said, into getting some more insurance, or looking into it.

Betty's major concern was tranquility and protection for herself and her family. She contacted Stan Towerman. Together they began to convince the deceased to obtain additional life insurance. Finally, after considerable prodding, the deceased sought to have CFI pay the policy premiums, and when the corporation agreed, under the split-dollar plan, he sought the insurance. These circumstances strongly indicate that the then present, and ongoing peace of mind of his wife was a major consideration in the decedent's acquisition of the insurance policy. Additionally, they show that the decedent sought to quiet the persistent nagging and prodding by his wife and Towerman. By obtaining the insurance he shut them up, so to speak.

Finally, we disagree with respondent's argument that the decedent put the policy in Betty's name instead of his own solely because he sought to avoid estate taxes—a non-life motive. See sec. 20.2035–1(c), Estate Tax Regs.; *Estate of Hunt v. Commissioner*, 14 T.C. 1182, 1191 (1950). The policy was put in Betty's name upon the advice of Stan Towerman, an estate planning specialist. We do not doubt that Towerman's motive in having the policy put in Betty's name was, at least in part, to save on estate taxes, but the evidence indicates that this was not a major concern of the deceased. In June of 1974, the decedent's mother made a gift to him of all of her CFI stock—then 43 percent of the outstanding shares. Clearly, if the decedent had been concerned with impending death and the incidence of estate taxes he would have persuaded his mother to give the shares to Betty and/or his sons.

Although we do not suggest that the decedent never considered the tax ramifications of the transfer, the weight of the evidence leads to the conclusion that any such considerations were merely incidental to his dominant motivation for making the transfer—to provide tranquility and composure to his wife and children. See *Estate of Hunt v. Commissioner, supra* at 1191.

Since it is our conclusion that the decedent's motivation in having the policy put in Betty's name was not motivated by the avoidance of the estate tax, the purposes of section 2035 would not be served by inclusion of the policy in his gross estate. In so holding, we find it unnecessary to determine whether the decedent "designated" Betty as owner of the policy, whether he paid its premiums, and whether these factors together amount to a transfer of the policy. See *Chase National Bank v. United States*, 278 U.S. 327 (1929); *Bel v. United States*, 452 F.2d 683 (5th Cir. 1971); *Estate of Coleman v. Commissioner*, 52 T.C. 921 (1969).

To reflect the petitioner's deduction from the gross estate of attorney fees related to the prosecution of this action pursuant to Rev. Rul. 78–323, 1978–2 C.B. 240, and respondent's determination of the correct amount of the credit for State death taxes pursuant to section 2011,

*Decision will be entered under Rule 155.*